ALFRED KING *et al.*, Plaintiffs-Appellees, *v.* EXCHANGE NATIONAL BANK OF CHICAGO, Trustee, *et al.*, Defendants-Appellants.

First District (2nd Division)   No. 76-1312

Opinion filed September 5, 1978.

336

Beverly, Pause, Duffy & O'Malley, of Chicago (Frank J. Pause, John J. O'Malley, Dom J. Rizzi, and Michael W. Rathsack, of counsel), for appellants.

Fleischer & Kumlin, Ltd., of Chicago (Richard L. Kumlin, of counsel), for appellee Alfred King.

Richard C. Feltman, of Mt. Prospect, and William J. Harte, Ltd., of Chicago, for appellees Eva Carr and Leonard Eingorn.

Mr. JUSTICE BROWN delivered the opinion of the court:

Plaintiffs, Alfred King, Margaret Budz, administratrix of the estate of Eli Joseph Jage, deceased, and Leonard Eingorn, administrator of the estate of Dora Eingorn, deceased, filed separate actions for damages resulting from a fire in the apartment building in which plaintiff King and the decedents had resided as tenants. The cases were consolidated and Eva Carr was substituted as administratrix of the estate of Eli Joseph Jage. The defendants are a land trustee, 13 beneficial owners, a real estate management firm, and a building manager.

The complaints and amended complaints alleged that the defendants negligently, carelessly and improperly maintained and controlled the building. They further alleged violations of various city ordinances relating to fire prevention and protection.

The jury rendered verdicts in the amounts of $150,000 for King, $15,000 for Carr, and $10,000 for Eingorn. Judgment was entered on the verdicts and defendants' post-trial motion was denied. The defendants appeal from the entry of the judgment.

The defendants raise the following issues for our review: (1) whether the plaintiffs proved negligence and proximate causation and whether they are guilty of contributory negligence as a matter of law; (2) whether prejudicial error was committed by plaintiffs' introduction into evidence of matters relating to fire alarms, smoke detectors, fire escapes and the fire resistant quality of the doors between the stairwells and the hallways; (3) whether prejudicial error was committed by the admission into evidence of testimony regarding the intoxication of the building manager; (4) whether prejudicial error was committed by giving plaintiffs' instructions Nos. 16, 17, 34, and 30; (5) whether the trial court erred in denying the defendants' motion for judgment n.o.v.; and (6) whether the verdicts are against the manifest weight of the evidence.

The fire occurred on Sunday, May 10, 1970, in a 39-apartment, 4-story brick building located at 215 N. Central Avenue, Chicago, which had been built in 1926. Plaintiff King and the janitor of the building, Phillip Ventincinque, testified that the apartments were furnished. Alvin Goldstein, a defendant beneficiary and owner of defendant LaSalle Mortgage and Realty Company, testified that the apartments were unfurnished.

Plaintiff King and the decedents lived on the fourth floor in separate apartments. King was age 39, Jage was age 67, and Eingorn was age 61 at the time of the fire. King was seriously injured and Jage and Eingorn died from asphyxiation due to smoke inhalation.

The record reveals that the building was located on the east side of Central Avenue and it extended west to east. The first floor was on the garden level, "half up on ground and half below ground." The garden level had 5 or 6 apartments in the front of the building, and a laundry room, a storeroom, and furnace in its own enclosure in the rear of the building. There were two entrances for the building, one in the front and the other in the rear.

The door to the front entrance opened into a vestibule. The interior door in the vestibule was kept locked, and could be opened by key or by use of an intercom system activated by a tenant inside an apartment. A corridor with a concrete floor ran from this interior door to the rear exit door, which was kept locked and had a "panic lock" which would allow a person to push the door open from the inside of the building. There was a passenger elevator off this corridor which stopped at each floor. On the south side of this corridor in the front of the building was the "front stairwell" and on the north side of this corridor in the rear of the building was the "rear stairwell." Both stairwells were enclosed, were composed of wood, and ran to the fourth floor level. Only the front stairs were carpeted. There were hallways on the other three floors running east and west, which were separated from the stairwell landings by doors with doorchecks; the lower half of these doors were solid wood and the upper half was glass. There were 11 or 12 apartments on each of the other three floors.

Plaintiff King testified that on Saturday, May 9, 1970, he spoke with the building manager, defendant Betty Doupe. He testified that she took him to the rear stairwell and showed him a large plush chair that was located on the concrete floor under the rear stairwell, and asked him whether he would like to have the chair for his apartment. He stated that he told her "Well, I don't know." He further testified that he had seen the same chair on the previous Thursday or Friday, and that he had seen furniture under the rear stairwell maybe 15 or 20 times prior to May 9, 1970. He stated that he had seen people loitering near that area "quite often" prior to May 9, 1970. He testified that at about 7:30 p.m. on May 9, 1970, he went down to the garden level to do laundry and saw the same chair, but it had been moved so that only half of it was under the rear stairwell. He returned to his apartment and when he came back down to retrieve his laundry, he noticed that the chair was positioned so that it was still only partially under the stairwell.

King testified that he went upstairs and put his laundry away. He went outside his apartment and gathered reading material from garbage cans which were located on each level of the stairway. At that time, he noticed that the doors between the rear stairwell landings and the hallways at each floor were open. He testified that he could not recall them ever being

closed during the seven months he lived there. He testified that he never saw the doors closed between the front stairwell landings and the hallways. He stated that he used the stairs 90% of the time he went up and the elevator was broken most of the time and very slow. He retired for the evening about 11 p.m.

He testified that the next thing he remembered was waking up about 4:45 a.m. to a room filled with smoke. He opened his apartment door and saw red and black smoke billowing up the rear stairwell, and slammed his door. He opened all of his windows and called to people across the way to call the fire department. He then waited on the bathroom window ledge. His shirt caught on fire, he hung on the window, let go, and fell 4 stories to the concrete. He was burned on his back and sustained injuries to his arms, left shoulder, left leg and right Achilles tendon. Prior to the fire, he worked as a helper on a beer delivery truck. At the time of trial, he had not returned to work since the fire.

Herman Robinson, Jr., a third-floor tenant, testified that on May 10, 1970, at approximately 3 a.m. or 3:30 a.m., he went down the back stairs and saw an old man, whom he described as drunk, sitting in a chair directly underneath the stairway. He was not able to carry on a conversation with the old man. He testified that the door to the third floor was propped open with a rubber wedge. He stated that the doors to the front and back were always open. He was in his apartment at the time of the fire, and was lowered out the window of another apartment.

Plaintiff Carr, daughter of the decedent Jage, testified that she saw her father approximately five times per week and that she saw Betty Doupe, the building manager, about two or three times a week. She testified that she was in the apartment building twice on May 9, 1970, and that the doors separating the front stairwell from the hallways were open when she left at 10:30 p.m. She stated that on May 9, 1970, at approximately 1 p.m., she came to pick up a check from Doupe that her father had written. The following exchange then occurred:

> "MR. FELTMAN: Did you notice anything unusual about her at that time?
>
> MR. O'MALLEY: Objection.
>
> THE COURT: No. She may answer.
>
> CARR: Yes.
>
> THE COURT: This is the day before the fire?
>
> MR. FELTMAN: The day before the fire.
>
> CARR: Yes, sir, I did.
>
> MR. FELTMAN: What was that?
>
> CARR: She was intoxicated, definitely intoxicated.
>
> MR. FELTMAN: Had you ever seen her in this condition before?

CARR: Yes, I did on several occasions.

MR. FELTMAN: About how often?

CARR: Well, she usually either had a drink in her hand or was intoxicated or well on her way every time I saw her."

Plaintiffs' counsel summarized this testimony during final argument as follows:

"As she walked into the building, she saw Betty Doupe in the hallway. She came to get her check. She got her check.

What was the condition of Mrs. Doupe? 'Oh she was intoxicated.'

'Had you ever seen her in that condition before?

'Many times. I had been there five days a week.' "

Defendant Goldstein testified that Doupe had full authority over the day-to-day management of the building. Ventincinque testified that Doupe was responsible for all the moving of furniture, and if he found anything under the stairs, he would first clear his removal of it with her. Defendant Doupe did not testify at trial, since she could not be located.

Plaintiff Eingorn, son of the decedent Eingorn, testified that he saw his mother approximately twice a week. He described the general condition of the interior of the building as "poor, not clean." He stated that the carpeting on the front stairwell was old and worn out.

Richard Julian, an investigator from the Bureau of Fire Investigation of the Chicago Fire Department, testified that he commenced his investigation when the fire was essentially extinguished. He testified that he, Lt. Kelly, and Investigator Bailey were unable to determine the exact cause of the fire, but they determined that the origin of the fire was at the base of the rear stairwell. At the base of the rear stairwell he found what appeared to be the debris of a charcoaled chair. It was partly to the side and under the stairwell. He testified that the pattern of the fire started at the base of the stairwell, traveled up vertically all the way to the fourth floor and then traveled horizontally down the hallways on the second, third and fourth floors. He stated that the fire was traveling horizontal openings as it was traveling vertically. He testified that it appeared that the second floor hallway was involved first and then the fire traveled to the front stairwell and up the front stairwell to the third and fourth floors.

After viewing photographs of the burned-out rear stairwell, Investigator Julian testified that doors are put in buildings of this type for fire stops and in his opinion the fire spread in the aforementioned fashion because there were either no doors in the hallways or the doors were open. He stated that open doors would cause the fire to spread more rapidly as there would be more burning area and more air from the halls. He testified that the path of the fire could have prevented egress from the third and fourth floors.

Investigator Julian further testified that he and his two partners

investigated all outlets of the general area including the area where the fire originated. He stated that they eliminated all accidental causes. They checked for suspicious origin, such as flammables or gasoline on the stairwell, and used an automatic detection device in connection therewith. He testified that since they were unable to find that someone accidentally or deliberately started the fire or a malfunction of the building, boiler, or electrical, the cause must then be called "undetermined." It was his opinion that the fire originated in the chair underneath the stairwell.

Investigator Julian testified that based upon the fire alarms being made in short intervals, this was a rapidly spreading fire and out of control until the main amount of equipment arrived on the last alarm. He testified from the fire department records that the first alarm was a still alarm about 5:44 a.m.

Defendant Goldstein, testifying under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 60), stated that the building had no fire escape and no fire alarm system. When he was later recalled under section 60, he testified that there were no fire alarm systems nor smoke detection devices in the building at the time of the fire. Upon defense counsel's request to be heard, a hearing was held outside the presence of the jury, and plaintiffs' counsel indicated that he would "tie it up" and "there is such an ordinance." Plaintiffs' counsel then elicited from Goldstein that to his knowledge there were no smoke detection devices above the doors between the stairwells and the hallways and that he did not know the fire resistant quality of those doors.

Francis Murphy, director of the Fire Prevention Bureau of the Chicago Fire Department, testified as to the existence of the ordinances prohibiting storing of materials under stairs and in an egress. He stated that the purpose of doors was to prevent the spread of fire.

On cross-examination by defense counsel, Murphy testified that on May 10, 1970, the building did not require outside fire escapes, enclosed stairways, sprinkler systems, fire hoses, fire alarms, or smoke detection devices above doors. He stated that it did not require fire doors if it was built in 1926, but he thought you would have to ask the building department that question. He testified that the building did not have any code violations pertaining to fire at the time of the fire, according to his inspection.

On redirect examination, Murphy was asked "would a building of this type built in January of 1970 be required to have an enclosed stairway and doors in a closed position?" Outside the presence of the jury, he replied "you would have to call the building department in here and make them answer that statement."

The plaintiffs rested their case and the trial court instructed the jury as follows:

"Ladies and gentlemen, I hereby instruct you as a matter of law

that various ordinances of the City of Chicago as they apply to fire prevention and fire safety do not apply to this building as of the date of the fire with reference to fire escapes, enclosed stairways and elevator shafts with fire resistant materials, fire doors, sprinkler system, fire hose, fire alarms, smoke detection devices and fire resistant quality of doors.

Disregard any testimony along those lines."

The defense called Frank Barnes, chief code enforcement officer for the Department of Buildings of the City of Chicago, as its first witness. He testified on cross-examination by plaintiffs' counsel that this building built in 1926 was required to have doors between a completely enclosed stairwell and the hallways. The following exchange then occurred:

"MR. KUMLIN: If in fact the building in 1970 wasn't necessarily required to have all of these things, but it didn't have them, would this not have to be maintained then pursuant to the code as it existed in 1970?

BARNES: Yes, it would have to.

* * *

MR. KUMLIN: Now, there has been testimony that this building didn't have these stairwells and these doors on May 10, 1970? Now, sir, would it be a violation of the Building Code to have those doors in open position.

BARNES: Yes, it would be."

The plaintiffs submitted Illinois Pattern Jury Instructions, Civil, No. 60.01 (2d ed. 1971) (hereinafter IPI) containing portions of sections 78—15.6, 78—18.2(b), and 67—10.4(e) of the Municipal Code of Chicago, as plaintiffs' instruction No. 30. It was given to the jury and is as follows:

"There were in force in the City of Chicago at the time of the occurrence in question certain ordinances which provided that:

'No combustible or flammable materials * * * shall be placed, stored or kept in any place inside or outside of any building where the ignition or burning of such materials * * * would obstruct or render hazardous the egress from any family unit or from the building.'

'Every owner or operator must maintain in a clean, sanitary and safe condition the shared or public areas of the dwelling or premises, and maintain * * * any equipment of a type specified in this code which he supplies or is required to supply.'

'No * * * storage space shall be located beneath stairs.'

If you decide that the defendants violated one or more of the ordinances on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence

in determining whether or not the defendants were negligent before and at the time of the occurrence."

Each plaintiff submitted IPI Civil No. 20.01 as plaintiffs' instructions Nos. 16, 17, and 34. Each instruction was given to the jury and stated:

"* * * that the defendants were negligent in one or more of the following respects:

Permitted refuse and furniture to remain in and about the stairwells of the building in question;

Kept and permitted the stairwell doors to remain in an open position, increasing the risk of spread of fire;

Maintained the premises in violation of the ordinances of the City of Chicago;

Failed to make adequate inspections of the building so as to eliminate potential fire hazards;

Maintained the premises in a state of disrepair."

We next turn to a consideration of the issues presented by the defendants.

The defendants' first contention is that the plaintiffs failed to prove negligence and proximate causation, and that plaintiffs were guilty of contributory negligence as a matter of law.

■■■ The evidence supports a finding that the defendants violated the following portion of section 78—15.6 of the Municipal Code of Chicago:

"No combustible or flammable materials * * * shall be placed, stored or kept in any place inside or outside of any building where the ignition or burning of such materials * * * would obstruct or render hazardous the egress from any family unit or from the building."

We also hold that the defendants had a duty, apart from this ordinance, of maintaining the premises so that combustibles would not be stored under the wooden stairwells (see *Menth v. Breeze Corp.* (1950), 4 N.J. 428, 73 A. 2d 183; *Yelkovanoglu v. Gordon* (1st Dist. 1974), 19 Ill. App. 3d 261, 311 N.E.2d 322), and that the evidence supports a finding that the defendants violated this duty.

■■■ The Municipal Code of Chicago required the building to have enclosed stairways with walls and partitions providing two hours fire resistance (section 62—3.2(a)) and self-closing metal fire doors (sections 62—3.6, 65—5). Barnes testified that the building was required to have doors between a completely enclosed stairwell and the hallways, that the doors would have to be maintained pursuant to the 1970 code, and that it would be a violation of the building code to have these doors in an open position. Barnes did not say these had to be metal fire doors, nor did plaintiffs' counsel identify the type of door he was questioning Barnes about. However, Investigator Julian testified "that doors are put in the

buildings of this type for fire stops." The trial court and this court may take judicial notice of these ordinances without them having been introduced into evidence. (*City of Countryside v. Oak Park National Bank* (1st Dist. 1966), 78 Ill. App. 2d 313, 315, 223 N.E.2d 293; Ill. Rev. Stat. 1975, ch. 51, par. 48a.) Even though the plaintiffs failed to introduce these ordinances into evidence and failed to ask that judicial notice be taken of them during presentation of evidence, since the defendants were apprised of plaintiffs' reliance on chapters 62 and 65 in the complaints and amended complaints, the defendants had prior knowledge of and adequate opportunity to determine the accuracy and validity of these ordinances and the plaintiffs would have been entitled to a jury instruction containing the pertinent portions of these ordinances. (*Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 391, 356 N.E.2d 93.) The plaintiffs did not include the pertinent portions of these ordinances in their Instruction No. 30, as the trial court had previously stricken the references to chapters 62 and 65 in their amended complaint upon defendants' motion. However, the trial court allowed plaintiffs' instructions Nos. 16, 17, and 34 to include:

> "* * * that the defendants were negligent in one or more of the following respects:
>
> * * *
>
> Kept and permitted the stairwell doors to remain in an open position, increasing the risk of spread of fire; * * *."

Section 62—3.6 of the Municipal Code required fire doors to be self-closing. We find that the plaintiffs established the defendants' duty, under this ordinance, to keep the wood doors that existed closed so as to prevent the spread of fire. The defendants state in their brief in this court that it cannot be disputed that the doors were always left open. Investigator Julian testified that open doors would cause the fire to spread more rapidly as there would be more burning area and more air from the halls. The evidence supports a finding that the defendants violated their duty to keep the doors closed so as to prevent the spread of fire.

The jury could find that each breach of duty was a proximate cause of plaintiffs' injuries and deaths. The defendants should have foreseen that a fire originating in a large plush chair would spread rapidly to the wooden steps immediately above it and that open doors would cause that fire to spread even more rapidly. The intervening force which caused the chair to ignite was not a superseding cause of plaintiffs' injuries and deaths. It did not break the chain of causal connection, as this force was itself probable or foreseeable, in view of the circumstantial evidence. (See *Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 394-95, 356 N.E.2d 93.) The circumstantial evidence as to what caused the chair to ignite was the testimony of plaintiff King as to people loitering near the rear stairwell

area "quite often" prior to May 9, 1970, and the testimony of Robinson as to a drunk old man sitting in the chair approximately one to two hours before the fire. It is not unforeseeable that a fire might start under these circumstances.

■■ The defendants argue that plaintiffs were guilty of contributory negligence as a matter of law in failing to close the doors between the stairwells and the hallways. "Ordinarily, the issue of contributory negligence is a question of fact (*Novotny v. Mott* (1972), 9 Ill. App. 3d 252, 254, 292 N.E.2d 87), and it becomes a matter of law 'only in those cases in which all of the evidence, when viewed in its aspect most favorable to the [plaintiff] so overwhelmingly favors the [defendant] that no contrary verdict based on that evidence could ever stand.' *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14." (*Connolly v. Melroy* (1978), 63 Ill. App. 3d 850, 380 N.E.2d 863.) In the instant case, this was a fact question properly submitted to the jury. The evidence does not support a finding that each plaintiff failed to act the way an ordinary prudent person would act under like circumstances.

■■ The defendants' second contention is that prejudicial error was committed by plaintiffs' introduction into evidence of matters relating to fire alarms, smoke detectors, fire escapes and the fire resistant quality of the doors between the stairwells and the hallways. Plaintiffs were entitled to present evidence regarding the fire resistant quality of the doors in light of the requirements of chapters 62 and 65 of the Municipal Code of Chicago. The failure of plaintiffs "to tie up" to an ordinance, evidence relating to fire alarms, smoke detectors, or fire escapes which they had advised the court they would do, was cured by the trial court's oral instruction to disregard this testimony and the later specific instruction given to the jury to disregard testimony which the court had ordered stricken.

■■ The defendants' third contention is that prejudicial error was committed by the admission into evidence of testimony regarding the intoxication of the building manager. The defendants have waived consideration of this question since they failed to object to the testimony and failed to object to plaintiffs' counsel's summation of that testimony during final argument.

The defendants' fourth contention is that prejudicial error was committed by giving plaintiffs' instructions Nos. 16, 17, 34, and 30. We find no error as regards these instructions. No. 30 recited portions of applicable ordinances and Nos. 16, 17, and 34 include issues supported by the evidence.

We find the defendants' fifth and sixth contentions to be without merit. The trial court did not err in denying defendants' motion for judgment

*n.o.v.* under the *Pedrick* standard, and the verdicts are not against the manifest weight of the evidence.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS, P. J., and PERLIN, J., concur.