DAVID S. KINSEY *et al.*, Plaintiffs-Appellees, *v.* WARREN J. KOLBER, Defendant-Appellant.

First District (1st Division)    No. 80-2723

Opinion filed January 18, 1982.

Willis R. Tribler and Douglas C. Crone, both of Haskell & Perrin, of Chicago, for appellant.

Harold L. Jacobson, Richard E. Mueller, and Hugh C. Griffin, all of Lord, Bissell & Brook, of Chicago, for appellee Stephen D. King.

Lawrence L. Kotin and Michael W. Rathsack, both of Chicago, for appellee David S. Kinsey.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiffs David S. Kinsey and Stephen D. King filed separate suits against defendant Warren J. Kolber alleging that defendant negligently operated a station wagon in which they were passengers causing Kinsey to become paraplegic and King to sustain brain damage. The suits were consolidated for trial, and after a jury trial, judgment was entered for Kinsey in the amount of $1,569,000, and for King in the amount of $465,000. Defendant raises the following issues on appeal: (1) whether the trial court erred in refusing to direct a verdict for the defendant based upon the Iowa guest statute; (2) whether the trial court erred in allowing the attorneys for the plaintiffs to question the jurors during *voir dire* concerning a specific verdict amount and their experience in the insurance business; (3) whether the verdicts were excessive and against the manifest weight of the evidence; and (4) whether the trial court erred in admitting certain items of evidence which either individually or cumulatively denied defendant a fair trial.

For the reasons set forth herein the judgment of the circuit court is affirmed.

FACTS

At trial Officer Gary Hoskins, an Iowa State trooper, testified that on May 14, 1976, he received a call to investigate an accident that happened on the bridge crossing the Cedar River in Iowa on Interstate 80. He described the bridge where the accident occurred as consisting of two westbound lanes, each 12 feet wide. On the outer edge of each lane there is a shoulder three feet in width, and a nine-inch curb from the shoulder area upon which guard rails sit on either side of the bridge. Officer

Hoskins testified that when he arrived at the scene of the accident he observed that traffic was backed up in the right lane, and that there was a car stopped facing eastbound in the westbound lane in the slower traffic lane. He testified that he also observed that some bridge railing had been taken out. Other officers at the scene informed him that a car had gone off the bridge railing and was down below in the embankment. He proceeded below with first aid equipment and blankets, where he observed a car with two subjects pinned inside. Stephen King was in the front passenger seat, and David Kinsey was in the rear of the car. The top had been mashed down and the doors would not open. King complained of a headache and Kinsey complained that his lower torso was bothering him. Defendant identified himself as the driver and indicated that he was not hurt. A local rescue unit transported the parties to the University of Iowa Hospital in Iowa City, Iowa. Officer Hoskins testified that he looked over the other car involved in the accident, which was operated by Dorothy Campbell, and observed damage to the entire right side of her vehicle. Measurements taken by Officer Hoskins at the scene of the accident showed that at a point close to the middle of the bridge, a tire on the Kolber car had hit the nine-inch curbing after which the car travelled 23 feet, scraped 179 feet of bridge railing, took out 112 feet of bridge railing, and then travelled on top of the bridge railing for 39 feet before landing in the embankment 27 feet below the bridge.

Russell Kennell testified that on May 14, 1976, as he was driving westbound in the right lane on Interstate 80 several hundred yards from the Cedar River bridge, he observed a semi-truck in the right lane and a station wagon in the left lane on the bridge. The car was behind the truck, but it appeared to be pulling up to pass the semi-truck on the left. Both the truck and the station wagon appeared to be going faster than he was, and he estimated his speed at about 60 to 62 miles per hour. He saw the truck move from the right lane to the left lane and come very close to hitting the car. The car swerved back to the right and hit the side of the bridge. As soon as the car hit the bridge there was a cloud of dust and he saw nothing else. He stopped his vehicle at the beginning of the railing that had been sheared off. By this time the dust had cleared and he observed the Campbell car facing south across the two lanes of traffic. He also observed damage to the right side of the Campbell car. The truck had left the bridge and was continuing on down the interstate. When he looked under the bridge for the station wagon he saw it sitting on its wheels on the riverbank with the top squashed down. He moved the Campbell car out of the way and started traffic going.

Dorothy Campbell testified that she was involved in an accident on May 14, 1976, on Interstate 80 as she was proceeding westbound in the right-hand lane on a bridge. Traffic was pretty heavy. She was going 50

miles per hour. Just before the accident occurred she glanced up into the rear-view mirror and saw the car she was involved with in the accident coming pretty fast as she was approaching the bridge. She did not see a truck. After she got on the bridge she saw the car whip right in behind her. The car struck her on the right-hand side. She saw a "bunch" of dust and felt her car being pulled toward the railing. She took her foot off the accelerator and was just steering, trying to keep from going over the bridge. Her car did not slow down. It felt like the car released her, and she skidded to a stop. When she stopped she was facing the way she had come across both lanes. The side of the car was dented and scraped from the back to the front. She went over to the railing where it had been torn out and looked down. She saw a car with some boys in it and one boy walking around. Mr. and Mrs. Kennell came up. Mr. Kennell later moved her car.

*David Kinsey*

Claire Kinsey testified that she is David Kinsey's mother, and that David was born October 29, 1959. She stated that prior to May 14, 1976, David's health was excellent. On May 14, 1976, David was 16 years old, he was six feet two inches tall, weighed over 200 pounds, and was in his junior year of high school at Glenbrook North High School in Northbrook, Illinois. About 5:30 p.m. she received a phone call from Mrs. King that the boys had been in an accident. She flew to Iowa City, Iowa, where David was in the intensive care unit at the University of Iowa Hospital. David was conscious, but he was unable to communicate because he was on a life-support system. He had a tube down his throat with a respirator breathing for him. He had just come out of surgery and had a 14-inch incision down his front. Doctors informed her that David's spleen had been removed, and that he had a torn diaphragm. She was also told that his back was broken, and that he was paralyzed. Back surgery was delayed about three weeks because David had wounds on his back which had to heal first. He was in a Stryker bed until after the back surgery. He was then put into a regular bed, but was in a complete body shell. David was a patient at the University of Iowa Hospital until July 2, 1976. The family bought a station wagon that could hold a full-sized mattress to transport David home. The day after he arrived home his leg swelled up. This was diagnosed as a blood clot. He was admitted to the Rehabilitation Institute and transferred to Wesley Hospital for treatment which lasted one week, and then transferred back to the Rehabilitation Institute. A week later he was again transferred to Wesley Hospital for treatment of urinary problems. At this time David had an in-dwelling catheter. When the problems were resolved he was sent back to the Rehabilitation Institute where he remained until October 8, 1976. David's weight had

dropped to 131 pounds. He had trouble with IV's in his arm; he could not straighten his arms. At the Rehabilitation Institute he worked with weights to strengthen his arms, and they worked with extension of his arms so he could straighten and use them both. He was taught to dress himself. He was trained to tolerate sitting up straight without blacking out. His parents had two ramps built so he could get in the front door. David returned home and completed his senior year of high school. He could not tolerate sitting up longer than 10:30 a.m., so he had special permission to go home early every day. He had to check in at the Rehabilitation Institute weekly, and he went back to the Rehabilitation Institute for a decatheterization program in January which lasted five weeks. He was in a wheelchair. The in-dwelling catheter was removed, and David had to catheterize himself four to five times a day. He also eventually managed his bowels by himself by manipulation. David entered the University of Arizona in August 1977. He returned home after the first semester and was treated at Glenbrook Hospital for mononucleosis and strep throat. He also had a stone in his bladder. The bladder stone was removed in March 1978 by Dr. Stanisic at the University of Arizona Hospital. In August 1978, Dr. Ignatov performed a sphincterotomy at Evanston Hospital to remove the sphincter from the urinary canal. After the surgery David had no control over urination and needed a constant bag attachment. In July 1979, he got a blood clot in his leg again. He was treated at the University of Arizona Hospital. The rods in his back broke and had to be removed in August or September 1979. In March 1980, David was hospitalized for testing to determine if he could reproduce. The result was that he cannot.

John Kinsey, father of David Kinsey, testified that he had to ramp the front of the house to accommodate David in his wheelchair. He had to make a box spring replacement for David's old box springs so he could transfer from bed to wheelchair as well as to stabilize his back. He also had to raise the table legs so David could sit at the table.

David Kinsey testified that he is a junior at the University of Arizona studying accounting. He testified that he was lying down in the second seat of the station wagon on May 14, 1976, and that Warren Kolber was driving. The first knowledge he had of anything unusual happening was when he heard Stephen King yell, "Look out!" He sat up and caught a glimpse of a truck. The next thing he remembered, the car had settled on the ground and he was pinned. In high school he was a varsity soccer player and an all-star baseball player. He also played hockey and intramural basketball and softball. Now he lifts weights and swims.

The evidence deposition of Dr. Bruce Sprague, an orthopedist, was read into the record. Dr. Sprague first saw David Kinsey on May 14, 1976, in the intensive care unit at the University of Iowa Hospital. When he saw David he had a fractured dislocation of T 12 on L 1, the junction between

the thoracic spine and the lumbar spine, secondary to a motor vehicle accident which had occurred that day. He had a sensory level of T 12 with no sensibility below. He had no motor function or reflexes below the T 12 level. He testified that David was paralyzed and would not be able to move his legs. He would not be able to move his limbs except for some flexion of the hips with some innervation from up high transmitted down. The paralysis affects the ability of the sphincter to contract and the ability of David to bear down to evacuate his bowel, making him incontinent. David is unable to contract his bladder to empty it. The general surgeon had examined David and found a splenic rupture and a rupture of the diaphragm. The spleen had been removed and the diaphragm had been repaired. David was scheduled for surgery to realign the spinal column using Harrington rods and bone graft to stabilize the fracture and get him out of bed and started on his rehabilitation process. The surgery was postponed when an abrasion was discovered on his back. David was returned to his Stryker frame and started on skin care to clean up the area of the abrasion. Dr. Sprague performed the surgery June 3, 1976. He reduced the fracture dislocation by use of Harrington rods and then bone grafted from T 12 to L 2. David was encased in plastic acrylic shells to immobilize the trunk during the early months of rehabilitation. Following surgery he was to start rehabilitation to get him into a wheelchair and teach him to transfer from wheelchair to bed and bed to chair. The in-dwelling catheter was removed and David was taught self-catheterization. He was taught to inspect his skin with mirrors to prevent breakdowns and pressure sores. He was instructed on bowel care. He was instructed on physical therapy on upper extremity exercises. He was released July 2 with an outpatient appointment at the Chicago Rehabilitation Institute. David's paralysis is permanent. His spinal cord has been injured beyond the ability to recover.

Dr. Vinod Saghal testified that he is a neurological and rehabilitation specialist. David Kinsey became his patient in July 1976, when he was transferred to the Rehabilitation Institute from the University of Iowa Hospital. He was examined and his paraplegia was confirmed. He was paraplegic from the groin down with sensory loss in that area. He was at the Institute for 3½ months. While there David developed a urinary tract infection which was treated; he developed thrombophlebitis which was treated; and, he developed a pulmonary embolism which was also treated. David could not sit up straight in a wheelchair. He had to start up slowly, first 30 degrees, then 45 degrees, up to 90 degrees. He started training in a bowel program and intermittent catheterization. The thrust of his rehabilitation program was upper extremity strengthening, trunk strengthening, sitting, balancing, transfer from bed to wheelchair, wheelchair to commode, wheelchair to car, car to wheelchair, dressing,

undressing, fixing simple lunches, and other activities of daily living. He also had psycho-social training. David will require routine visits to a physician who looks at skin condition, bladder condition, range of motion, makes sure his upper extremities stay strong, and assesses his vital capacity and his attitude. He can expect to spend 30 to 35 days a year in the hospital. The spinal-cord-injured person is unable to put in an eight-hour work day, and his work schedule is punctuated by hospitalizations.

Dr. Thomas Stanisic, a urologist, testified that he first saw David Kinsey on February 8, 1978. He observed that David was in a wheelchair, and was paralyzed from the waist down. He reviewed X rays sent to him by Dr. Ignatov, and he scheduled David for surgery to remove a bladder stone. When he first saw David he was passing a rubber tube into his penis about four to six times a day to release the urine. In addition, because the muscle that controlled the urine had been damaged, he was wearing a device over the end of his penis so that accidents didn't occur in public and embarrass him. The sphincter that controlled his bowel was also not working, and at that time David tried to keep his stools very hard and would stimulate his bowels with a gloved finger. He also used suppositories. The bladder stone was removed March 13, 1978. David was hospitalized until March 18 because he suffered a urinary tract infection at the time of the surgery because of the stone. Dr. Stanisic stated that urinary tract infections are common in paraplegics. He next saw David on July 12, 1979, but prior to that time David had seen Dr. Ignatov and had the sphincter muscle cut. David was complaining of pain and swelling in his left leg which was diagnosed as thrombophlebitis, a common complaint in paraplegics. David's history revealed that he had been treated twice before for the same condition. David was hospitalized for treatment. Dr. Stanisic saw David again in August 1979, when he was admitted to have the Harrington rods which had broken, removed from his back. By this time the bone graft performed at the Iowa hospital had taken and his spine was stable. The spinal cord, however, was damaged. After the Harrington rods were removed David developed a urinary tract infection due to the surgery and the medicine he needed for the pain. Since he has no sensation Dr. Stanisic stated that David should see a doctor every three months and have his urine examined for evidence of infection. He should catheterize himself twice a month to make sure he is emptying his bladder, and he should have his kidneys X-rayed twice a year. He saw David again September 18, 1979, when David had another infection in his bladder, which was treated with oral antibiotics. At that time David questioned him about his sexual functioning, as he had not had an erection since the accident. David was hospitalized for tests, and it was determined that an organic lesion was causing his impotence. He testified that in about 30% of the cases when one cuts the muscle that controls the urine, a

scar forms and it will close the muscle down again, so that David may have to have a repeat operation. He also may have another stone in his bladder which may have to be removed. His kidneys may start to deteriorate, but this is unlikely.

Kinsey's attorney introduced into evidence the life table published by the United States Department of Health, Education and Welfare, showing Kinsey's life expectancy to be 51 years and six months. He also read into the record a stipulation with defendant that the amount of Kinsey's medical bills and expenses to date amount to $69,036.36.

*Stephen King*

Joyce King testified that she is the mother of Stephen King, and that Stephen was born June 30, 1959. She stated that up until May 14, 1976, Stephen was a normal healthy boy. On that date he was a junior at Glenbrook North High School in Northbrook, Illinois, where he was a good student. About 6 p.m., on May 14, 1976, she received a call from Mr. Kolber that the boys had had an accident in Iowa. The Kolbers drove her to the hospital, where she saw Stephen in the intensive care unit. He was comatose and unconscious. He was hooked up to many machines, a respirator, an EKG, a nose tube, intravenous in his arms, and a catheter. He was lying perfectly flat and perfectly still. They had performed surgery to insert a screw in the skull of the brain. The screw was approximately four inches long, and it was sticking up through his head. It was to measure the intra-cranial pressure of the brain and to put medication into the brain. He was a patient at the hospital until June 10, 1976. He was unconscious for one week, and in a semi-coma for two weeks. When Stephen became conscious he did not know who anyone was or where he was. He would say words, but they didn't mean anything, and he would thrash around in bed. On June 10 he was transferred to Highland Park Hospital in Highland Park, Illinois, where he stayed for 10 days. Stephen was then transferred to Evanston Hospital where he stayed for two weeks in the rehabilitation unit. When he went to the rehabilitation unit he still did not know who or where he was or who anyone else was. He couldn't walk, talk, or go to the bathroom. He had physical therapy, occupational therapy, and speech therapy three times a day. They were told that he had severe brain injury. Stephen had a back fracture and many cuts and bruises. At the University of Iowa Hospital he was fitted for a back brace which he wore until the middle of July whenever he was not perfectly flat in bed. When Stephen returned home on July 3, he still did not know who he was, who his family was, or recognize his friends or the house. He was using a three-pronged cane. He also had bedwetting problems until the middle of July. He didn't know the words for anything and he had to relearn everything. Mrs. King took

Stephen to Evanston three times a week for speech therapy, and she worked with him at home using flash cards until the middle of September. Stephen also had occupational therapy where he worked with pegs and puzzles, and physical therapy to try to control the spasticity in his leg. He did exercises at home as well. The outpatient physical therapy continued for over one year, and at home it continued for three years. Stephen returned to school in September for three hours in the mornings, and he had a tutor at home two days a week. Stephen completed his senior year of high school and enrolled at Oakton College in the summer of 1977 to relearn all his math. He stayed there for three more semesters taking remedial work in English and math. He was enrolled at the University of Wisconsin from August 1978 until December 1979, but they would not let him return because he could not keep up academically. He returned to Oakton where he was enrolled at the time of trial, having completed 44 credits. Prior to the accident Stephen had been athletic. In high school he had been on the golf team and had also played tennis and baseball. His activities are now limited because of his leg. He is not able to carry heavy things, his leg "locks up," he limps, and he wears a brace on his right foot. Since the accident he has become emotionally immature, has difficulty controlling his temper and bursts into tears. He now has a learning disability and concentration is a great problem. It is hard for him to remember things.

Stephen D. King testified that he was born June 30, 1959, that until May 14, 1976, his general health was pretty good, and that he played tennis every day. At school he played golf and was on the wrestling team; he also played basketball, football, softball, and "most everything." He stated that he is five feet six and one half inches tall and weighs 140 pounds. He does not recall any of the events of May 14, 1976. He has a few slight memories of being in Evanston Hospital. He recalls getting speech therapy at Evanston Hospital and working with the flash cards with his mother. He also recalls doing exercises at home. He testified that he wears a leg brace to stop him from tripping. He has trouble controlling his right leg and it locks up sometimes, and is hard to bend at the knee. He has a limp.

The evidence deposition of Dr. Carl J. Graf, neurosurgeon, was read into the record. He testified that Stephen King was a patient at the University of Iowa Hospital from May 14, 1976, until June 10, 1976, and that his main problem was neurological due to a head injury sustained May 14, involving the left cerebral hemisphere and the brain stem. An intracranial pressure screw was inserted into Stephen's brain to measure the pressure in the brain. He was thrashing around because he was hurt in different areas. Monitoring equipment was connected to the intracranial screw. He was given drugs to reduce the swelling. He had a urinary

catheter, and he was fed by a nasogastric tube. He was on a respirator to control his breathing.

Dr. Ivan Ciric, a neurosurgeon, testified that he first saw Stephen King on June 14, 1976. He found Stephen to be disoriented and confused as to where he was and why. He had difficulty recognizing people and placing them in proper surroundings and circumstances. He had difficulty understanding spoken language, and could not name objects shown to him. He had marked weakness of his right arm, increased reflexes on his right side, and weakness in his right leg with abnormal reflexes. His impression was that Stephen had sustained a left cerebral lesion, traumatic, likely a contusion, meaning a bruise of the left side of his brain resulting in a speech defect and in a weakness of the right side of his body. He recommended that Stephen be transferred to the rehabilitation unit at Evanston Hospital. An EEG performed on Stephen revealed resistance with involvement of the left side of the brain surface which controls the right side of the body, and injury to the brain stem. When seen shortly after discharge, Stephen showed remarkable recovery but remained somewhat slow, flat, and dull. The neurological examination revealed mild impairment of convergence with both eyes, a foot drop on the right side, and weaknesses on the right side of the body known as paresis, caused by injury to the brain. There had been a fracture of L 2 of the spine. When he saw Stephen in July 1980, he observed that some weakness in the right arm and to a greater degree in the right leg persists. Stephen continues to have slight mental slowness and weakness on the right side of his body. He has a memory deficit. He believed that Stephen had plateaued off.

Dr. Joseph Feldman, specialist in the rehabilitation of physical disabilities, testified that he first saw Stephen King on June 20, 1976, at Highland Park Hospital. He did a full consultation and a physical examination. Stephen had trouble with his language remembering the right word to use. He had impaired recent and past memory. He had some confusion knowing the right side from the left side, and he had some evidence of perseveration. There was some incoordination in the upper extremities, some spasticity in the muscles in the right leg and ankle, and weakness in the right hip and leg. There was some evidence of abnormal reflexes on both sides in the upper extremities, and sensation was decreased on the right side. He diagnosed Stephen as having cerebral trauma with a contusion of the left frontal lobe of the brain and decreased memory and language disturbance. Stephen was admitted to the Evanston Hospital Rehabilitation Center June 20, 1976, and discharged July 2, 1976. When Stephen entered the hospital he had trouble controlling his stool and urinary functions. He had trouble remembering. While there he received physical therapy to strengthen the muscles and improve his

walking; occupational therapy to work on the arms; intellectual activity; perceptional activity; and speech therapy because of his aphasia or language disturbance. When Stephen left the hospital he had some residual weakness and spasticity in the arm and right leg. He was walking with a short leg brace and a cane. He had a foot condition known as "foot drop." He cannot use his arm for most activities. He referred Stephen to Dr. Levine for psychological testing on August 17, 1976. Over defendant's objection Dr. Feldman read Dr. Levine's findings from a document that stated that Stephen showed evidence of grand brain dysfunction. When examined shortly before trial, Stephen had mild incoordination in the right upper extremity. He had a decrease in grasp strength compared to the left side and will probably have permanent mild incoordination in the right hand. The right leg was shorter than the left because he had developed a curvature of the spine. He had some mild persistent weakness in the ability to bring his toes up into a backward position, and there was some residual spasticity remaining in the leg consistent with brain damage. He had a mild spastic gait which is permanent. Stephen will probably have to visit him once a year. Stephen has a learning disability and will have trouble learning new material and remembering it.

Jack Arbit, Ph.D., clinical psychologist, testified that he saw Stephen King on June 10, 1980, for a diagnostic evaluation of his functioning. He administered several psychological tests. He testified that the pattern of results indicated the presence of chronic organic brain damage. He stated that this condition would reduce Stephen's level of vocational functioning in terms of memory functioning and in terms of capacity to organize, motivate, and direct his efforts in a productive way.

Dr. Carlo Scuderi, an orthopedic surgeon, testified that he examined Stephen King July 21, 1980, because he didn't have control of his right leg as a result of brain damage. Stephen was wearing a drop-foot brace on his right leg. He had a definite limp of the right leg. He testified that the drop foot will be permanent. He recommended that Stephen continue to use the brace.

King's attorney introduced into evidence the life table published by the United States Department of Health, Education and Welfare, showing King's life expectancy to be 50 years and one month. He also read into the record a stipulation with defendant that the reasonable value of the medical services rendered to King was $15,627.80.

### Defendant Warren J. Kolber

Defendant testified that he was born June 23, 1959, and that on May 14, 1976, he was just completing his junior year of high school at Glenbrook North High School where he and the plaintiffs were class-

mates. He was and continues to be friends with Stephen King and David Kinsey. On the morning of May 14, 1976, they were driving from Northbrook to Drake University in Iowa, in a car owned by Stephen King's parents, to pick up King's brother at a semester break and to look at the school. When the trip began he was in the front passenger seat of the station wagon, King was driving, and Kinsey was in the back seat. About five minutes after crossing the Mississippi River from Illinois into Iowa on Interstate 80, King said he was tired or bored, and Kolber began to drive. About 20 minutes later as he was crossing the bridge over the Cedar River he was travelling in the left lane at about 55 to 60 miles per hour. There was a semi-truck in the right lane going about 53 to 57 miles per hour. The truck began to move from the right lane to the left lane when it was about five to 15 feet in front of the car. He did not recall if the truck signalled a left turn. He took his foot off the accelerator but he did not remember braking. He attempted to go into the area the truck was leaving. He had no memory of what happened after that until the car came to rest on its wheels with him beneath the wheel. He testified that traffic was light, and that there was no traffic nearby ahead of him. He stated that he had been driving for six months. Over defense counsel's objection he also testified that he was enrolled in a driver education course at school, but had not completed the course.

OPINION

I

Initially defendant contends that the trial court erred in refusing to direct a verdict for defendant based upon the Iowa guest statute. Defendant claims that under *Ingersoll v. Klein* (1970), 46 Ill. 2d 42, 262 N.E.2d 593, Iowa law should apply, as Iowa is the State having the most significant contacts with the occurrence, the alleged negligence and the injury having occurred in Iowa.

Plaintiffs contend that the trial court properly ruled that Illinois law governed the trial of this cause because Illinois, and not Iowa, had the most significant relationship with the occurrence and the parties. (*Ingersoll v. Klein*.) Plaintiffs rely on the facts that both plaintiffs and defendant are residents of Illinois, an Illinois vehicle was involved in the incident, and the trip began and was ultimately to end in Illinois. Moreover, the Iowa guest statute was declared unconstitutional by the Iowa Supreme Court prior to the trial of this cause in *Bierkamp v. Rogers* (Iowa 1980), 293 N.W.2d 577. In *Bierkamp* the Iowa Supreme Court specifically declared that the guest statute would not be applicable to any case wherein the trial commenced after said opinion was filed. Plaintiffs further urge that defendant's motion for a directed verdict based upon the application of the Iowa guest statute was not timely made, as this theory

was raised for the first time at the conclusion of the evidence, after the case had been tried under Illinois law.

■■ We observe that none of the pleadings filed by defendant prior to the conclusion of the evidence contended that the matter should be tried under Iowa law, and we agree with plaintiffs that this issue has not been timely raised, and has therefore been waived.

## II

Defendant's second contention is that the trial court erred in allowing the attorneys for the plaintiffs to question the jurors during *voir dire* concerning a specific verdict amount and their experience in the insurance business. During *voir dire* Kinsey's attorney asked the panels of prospective jurors the following four questions:

> "(1) And you are going to hear figures of money damages that we feel we will prove to you under the law and the evidence in access [*sic*] of $2,000,000. Would you have trouble signing your name to such an amount of money in a verdict if it were proven under the law and the evidence to be a proper amount?
> (2) I have asked the other panel whether or not they would have any trouble at all if the evidence warranted it under the law that Judge Norman gives you, in finding a verdict in the sum in excess of two million dollars. Does that trouble any of your jurors?
> (3) Do you have any trouble at all with the sum of money, if I say to you we may ask you, based upon law and evidence and proof for a sum of money in excess of $2,000,000, does that sum immediately strike you as being something to do with?
> (4) Anything about the amount of money that I have mentioned to the other panels in any way that would disturb you? I said to the jurors that if after all the proof was in you heard a figure in excess of $2,000,000 as a damage request, would that in any way make you feel you couldn't partake as a juror in the kind of a verdict—if it were justifiable under the law?"

Defendant urges that these questions went beyond the legitimate scope of *voir dire* to effect an indoctrination of the jury, and evidenced an attempt to elicit a pledge, which constituted reversible error. (*Gasiorowski v. Homer* (1977), 47 Ill. App. 3d 989, 365 N.E.2d 43.) In support of his position defendant relies on the closing arguments during which Kinsey's attorney reminded the jury that they had said they could sign a verdict in the sum of $2,000,000 if the evidence so warranted. Defendant urges that this remark supports the indoctrination purpose of the questions asked during *voir dire*. In advancing this argument defendant is asking this court to overrule *Scully v. Otis Elevator Co.* (1971), 2 Ill. App. 3d 185, 275

N.E.2d 905, *Jines v. Greyhound Corp.* (1964), 46 Ill. App. 2d 364, 197 N.E.2d 58, *rev'd on other grounds* (1965), 33 Ill. 2d 83, 210 N.E.2d 562, and *Murphy v. Lindahl* (1960), 24 Ill. App. 2d 461, 165 N.E.2d 340, all cases where the court held that questions concerning a specific verdict amount tended to uncover jurors who might have bias or prejudice against large verdicts.

Defendant also claims that the questions asked during *voir dire* about the continued friendship of the parties suggested that this was a friendly lawsuit and that insurance would cover any judgment entered against defendant. He further urges that the questioning of specific jurors concerning a relationship with insurance was excessive and unfair and resulted in the disclosure of liability coverage at trial, which also constituted prejudicial error. *Marchlik v. Coronet Insurance Co.* (1968), 40 Ill. 2d 327, 239 N.E.2d 799; *Foster v. Lanciault* (1979), 70 Ill. App. 3d 962, 388 N.E.2d 1140; *Ferrer v. Vecchione* (1968), 98 Ill. App. 2d 467, 240 N.E.2d 439.

Plaintiffs urge that the trial court properly applied the rule of *Scully v. Otis Elevator Co.* and allowed the jurors to be queried as to their ability to return a large verdict if warranted by the evidence. Prior to the *voir dire* Kinsey's attorney notified the court that he intended to qualify the jury as to the verdict amount. Defendant objected to a specific amount. The court then proceeded to establish a procedure for such questioning, instructing counsel to read the *Scully* opinion and follow the mandate of that court in formulating the questions to the jurors. The court further instructed counsel to question a panel as a whole as opposed to each prospective juror. Plaintiffs claim to have followed the procedure set by the court pursuant to *Scully*, *Jines*, and *Murphy*.

Plaintiffs also claim that no objections were made to the procedure established by the court, to the questions subsequently asked, or to the remarks made during closing argument, and that these issues have therefore been waived on appeal. (*Kalalinick v. Knoll* (1981), 97 Ill. App. 3d 660, 422 N.E.2d 1011; *King v. Exchange National Bank* (1978), 64 Ill. App. 3d 335, 381 N.E.2d 356.) Plaintiffs also claim that no objections were made to the questions asked during *voir dire* concerning the relationship of some prospective jurors with insurance, or the friendship of the parties, and that defendant has therefore waived these issues as well. *Kalalinick v. Knoll*; *King v. Exchange National Bank.*

■■ Defendant has not pointed out any place in the record where he made an objection to the questions and remarks at issue herein, and we therefore agree with plaintiffs that these issues have been waived on appeal. (*Kalalinick v. Knoll*; *King v. Exchange National Bank.*) However, we elect to consider the issue concerning the questions asked during *voir dire* concerning a specific verdict amount. We have reviewed the record,

and we do not find that the examination engaged in by plaintiffs went beyond the bounds set by the trial court or by the *Scully* decision.

## III

Defendant's third contention is that the verdicts were against the manifest weight of the evidence and excessive. Defendant urges that he was confronted with a driving emergency when a truck changed lanes in front of him, and that he conducted himself reasonably under the circumstances. He claims that his move to the right lane was the only possible reaction to a truck which moved suddenly into his lane and flashed its brake lights, and that the unidentified truck was the proximate cause of the accident. (*Laflin v. Estate of Mills* (1977), 53 Ill. App. 3d 29, 368 N.E.2d 522; *Lukasik v. Hajdas* (1968), 104 Ill. App. 2d 1, 244 N.E.2d 404.) Defendant points out that although David Kinsey is a traumatic paraplegic and has serious physical problems attendant thereto, he is a student at the University of Arizona studying accounting, and that he will be able to work. He also points out that although Stephen King suffers from brain damage, he graduated with his high school class and has earned 44 hours towards a college degree. He claims that while there are areas where King is below average, there is nothing in the record to indicate that King is of less than normal intelligence and unable to function, and that King, too, will be able to work. The verdict for Kinsey was $1,569,000. At the statutory rate of nine percent per year, that sum would yield $141,000 per year, $90,000 more each year than the $51,000 Kinsey claimed at trial that he needed. The verdict for King was $465,000. At the statutory rate this amount would yield $41,850, $17,350 more a year than the $24,500 King claimed at trial that he needed. Defendant contends that these verdicts were the result of prejudice which resulted from plaintiffs' use of an improper formula to calculate damages. Pursuant to said improper formula Kinsey asked the jury for $30,000 a year for future pain and suffering, $11,500 a year for medical expenses, and $10,000 a year for loss of income, while King asked the jury for $10,000 a year for brain damage, $5,000 a year for disability, $7,500 a year for loss of income, and $2,000 a year for anxieties and for walking with an impeded gait.

■■ Plaintiffs argue that the verdicts were amply supported by the evidence and not excessive. They claim that the law in Illinois is that the evaluation and award of damages is preeminently within the province of the jury. (*Clark v. City of Chicago* (1980), 88 Ill. App. 3d 760, 410 N.E.2d 1025.) Kinsey claims that his catastrophic physical, mental, and financial injuries are more than ample in magnitude to support and justify the verdict. He further points out that defendant made no objection to any part of his closing argument, including that portion which concerned the

computation of damages. Since defendant did not object to any portion of the closing argument, he has waived said objection on appeal. (*Mulvey v. Illinois Bell Telephone Co.* (1973), 53 Ill. 2d 591, 294 N.E.2d 689; *Powers v. Illinois Central Gulf R.R. Co.* (1981), 92 Ill. App. 3d 1033, 416 N.E.2d 1161; *Kincl v. Hycel, Inc.* (1977), 56 Ill. App. 3d 772, 372 N.E.2d 385.) King claims that his permanent brain injury and the resulting permanent physical and mental disabilities, his pain and suffering, his disfigurement, his vocational, learning, and earning impairment, and his medical expenses all merited a verdict in excess of what was actually awarded. He, too, notes that defendant did not object to any portion of his closing argument, and has therefore waived any objection thereto. *Johnson v. Chicago Transit Authority* (1973), 11 Ill. App. 3d 16, 295 N.E.2d 573; *Fortner v. McDermott* (1971), 1 Ill. App. 3d 358, 272 N.E.2d 503; *Warp v. Whitmore* (1970), 123 Ill. App. 2d 157, 260 N.E.2d 45.

We do not agree with defendant that the verdicts were against the manifest weight of the evidence. There was evidence presented that defendant was an inexperienced driver who had been driving about six months, and that he attempted to pass a truck on a bridge at a speed in excess of 62 miles per hour. Dorothy Campbell testified that she glanced in her rear-view mirror and saw defendant's car "coming pretty fast" as she was approaching the bridge. After she got on the bridge she saw the car "whip right in behind her," after which she was struck on the right-hand side, and carried forward toward the railing. Although she took her foot off the accelerator and was just steering, her car did not slow down. Russell Kennell testified that as he was approaching the bridge at a speed of between 60 and 62 miles per hour, he observed a truck and a station wagon on the bridge ahead of him and that both appeared to be going faster than he was. When the truck signalled to change lanes defendant attempted to pass the truck on the right side. When defendant swerved into the right lane, he hit the bridge and collided with the car driven by Dorothy Campbell, dragging it for some distance. According to the testimony of Officer Hoskins he also scraped the curb for 23 feet, scraped the bridge railing for 179 feet, took out 112 feet of bridge railing, and travelled on top of the bridge railing for 39 feet before landing in the embankment 27 feet below the bridge. At trial defendant did not remember if the truck signalled a left turn, nor did he remember braking; however, defendant wrote out and signed a statement for Officer Hoskins on the day of the accident, in which he stated that when he was approaching the bridge in the left-hand lane, there was a truck that put on its left turning signal and started pulling to the left-hand lane. The brake lights came on the truck and he (defendant) decelerated. He (defendant) swerved back to where the opening was, and all he remembered after that was the car rolling off. He also stated that his speed was 55 to 60 miles

per hour. As a result of the manner in which defendant operated the motor vehicle both plaintiffs were seriously injured. We therefore agree with the plaintiffs that, contrary to the contentions of defendant, the jury was justified in finding that the manner in which defendant operated the station wagon was unreasonable under the circumstances, and that the evidence was sufficient to support the verdicts.

There was testimony that David Kinsey was 16 years old at the time of the accident. He was a normal, healthy high school junior who participated in many sports. After the accident he was permanently paralyzed from the waist down. There was a fracture dislocation of T 12 on L 1. The first lumbar vertebra had been crushed. His thoracic spine and his lumbar spine had shifted relative to each other, resulting in malalignment. He had no feeling from the waist down. His ruptured spleen had been removed, and his ruptured diaphragm had been repaired. Harrington rods were inserted in his back to stabilize the fracture and had to be surgically removed when they broke. Following his initial hospitalization David suffered from blood clots in his legs and developed a stone in his bladder. Surgery was performed on his sphincter muscle to allow his bladder to empty, and he now wears a bag attachment continually. He has suffered many urinary tract infections which are common for paraplegics. He is impotent. He has a normal life expectancy, which at the time of trial was 51 years. David's medical bills and expenses at the time of trial totalled $69,036.36. He must see a doctor every three months to have his urine examined, and he needs to have his kidneys X-rayed twice a year. He may need further urinary tract surgery. He will probably spend 30 to 35 days in the hospital each year for the rest of his life. He is not likely to be able to put in a normal work day because of the physical problems associated with his type of paraplegia. There was also testimony that at the time of the accident Stephen King was also 16 years old. He, too, was a normal, healthy high school junior who participated in many sports. After the accident he didn't know who or where he was or who anyone else was. He couldn't walk, talk, or go to the bathroom. He had a back fracture, cuts and bruises, and had sustained severe brain injury. He had to relearn everything, and he had lost control of his right leg. He continues to have mild incoordination in the right upper extremity, he has a decrease in grasp strength compared to the left side and will probably have permanent mild incoordination in the right hand. The right leg is shorter than the left. He continues to have some mild persistent weakness in the ability to bring his toes up into a backward position. He has a mild spastic gait which is permanent. He will probably have to visit a doctor once a year. He has a learning disability and will have trouble learning new material and remembering it.

■■■ We observe that defendant at no time objected to the method used

by both plaintiffs to calculate damages during closing argument, and defendant had therefore waived said issue on appeal. (*Mulvey v. Illinois Bell Telephone Co.*; *Powers v. Illinois Central Gulf R.R. Co.*; *Kincl v. Hycel, Inc.*) The law in Illinois is that the evaluation and award of damages is within the province of the jury. In view of the overwhelming evidence presented to the jury herein concerning the extent and permanency of the injuries sustained by these plaintiffs, their pain and suffering, their extensive past medical treatment and future medical requirements, and their diminished earning abilities, it cannot be said that the damages awarded were the result of passion or prejudice. *Clark v. City of Chicago*.

## IV

■■ Defendant's final contention is that the trial court erred in admitting certain items of evidence which either individually or cumulatively denied him a fair trial. He urges that he was prejudiced by the admission of hearsay medical testimony from the mothers of the plaintiffs and from Drs. Feldman and Arbit; that it was error to admit evidence that he had not completed his driver's training course at the time of the incident; that plaintiffs' attorneys made improper and prejudicial remarks during closing arguments; and that it was error to allow the plaintiffs to argue impeachment and for the court to so instruct the jury when defendant had not been impeached. Claire Kinsey testified to what David's doctors had told David and her about the nature, extent, severity, and effect of David's injuries. The testimony of Joyce King was substantially the same in nature concerning Stephen's injuries. Defendant claims that the sole purpose of this testimony was to prejudice the jurors against him and arouse their sympathy towards plaintiffs, and that the admission of this testimony constituted reversible error. (*Kiest v. Schrawder* (1978), 56 Ill. App. 3d 732, 372 N.E.2d 442.) Plaintiffs, on the other hand, urge that the testimony complained of on appeal was cumulative of the medical testimony of their respective treating physicians, and was based on the direct observations of Claire Kinsey and Joyce King. They further urge that since defendant failed to object to the complained of testimony at trial, he has waived this issue on appeal, and we agree with plaintiffs that the record supports their position that defendant did not object at trial to the admission of the medical testimony of Mrs. Kinsey or Mrs. King, and that this issue has been waived on appeal. *Kalalinick v. Knoll.*

■■ Over defendant's objection Dr. Feldman read aloud the findings of a Dr. Levine to whom he had referred Stephen King for psychological testing. He testified as to what tests were given by Dr. Levine and as to the tests' results. He testified further that these results as well as the results of psychological tests administered by Dr. Rozinsky were utilized in the treatment of Stephen in terms of helping him with his future education.

There was no objection to the testimony of Dr. Feldman concerning the tests administered by Dr. Rozinsky or the tests' results. On cross-examination Dr. Feldman testified that he was not familiar with the tests administered by Drs. Levine and Rozinsky to the extent that he would be able to give them, that such tests were outside his field of expertise, and that he took the tests' results on faith. Defendant contends that the admission of Dr. Feldman's testimony about the psychological tests administered to Stephen and their results also constituted reversible error. (*Mehochko v. Gold Seal Co.* (1966), 66 Ill. App. 2d 54, 213 N.E.2d 581.) King urges that the testimony concerning the psychological tests and their results which Dr. Feldman utilized as a part of his treatment of him was properly admitted in accordance with all recent Illinois decisions. (*People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171.) He urges that if the admission of this testimony was error the error was not prejudicial to defendant because Dr. Arbit testified to comparable results from psychological tests that he had administered to Stephen. We agree with plaintiff that the *Ward* case is dispositive of the instant issue. In *Ward,* as in the instant matter, the testifying doctor had relied in part on the results of psychological tests performed by another in formulating an opinion concerning the medical condition of a party. The Illinois Supreme Court held that a doctor may testify as to a party's medical condition based upon records or reports made by others who did not testify if such records or reports are of a type customarily utilized by the medical profession.

■■ Defendant claims that it was reversible error to allow Dr. Arbit, a clinical psychologist, to testify over his objections that the results of psychological tests administered by him to Stephen King indicated the presence of chronic organic brain syndrome. (*In re Wellington* (1975), 34 Ill. App. 3d 515, 340 N.E.2d 31.) He urges that Dr. Arbit, although not a medical person, was impermissibly permitted to give medical testimony. King urges that the *Wellington* case does not apply to the instant issue because in *Wellington* the court found error (but not reversible error) because there was no adequate foundation laid for the medical testimony of the nonmedical witness, while in the instant case Dr. Arbit did not express his opinion until after the trial court, at defendant's insistence, had established his qualifications to render such an opinion. Dr. Arbit testified that he holds both masters and doctor of psychology degrees from the University of Illinois, that he is a professor in the departments of neurology and psychiatry at Northwestern University Medical School, that he has had courses in the area of brain functioning and behavior, that he had done research in the area of brain functioning and behavior, that he teaches classes for neurologists, both in training and in practice, in the

areas of physiology, biochemistry, and brain function, that three quarters of the diagnostic work he does is the psychological testing of brain-damaged people, and that for the last 22 years he has seen an average of five or six brain-damaged patients a week. King urges that with Dr. Arbit's credentials and qualifications so thoroughly established, the fact that he did not have a medical degree was no bar to his testimony. (*Buckler v. Sinclair Refining Co.* (1966), 68 Ill. App. 2d 283, 216 N.E.2d 14.) In *Buckler* the court held that a witness who possessed a Ph.D. degree, and was a practicing clinical psychologist and a member of the faculty of the medical school of a university, was qualified to express an expert opinion that the plaintiff who sought damages for injury was reacting to brain damage. We find the *Buckler* case dispositive of the instant issue on appeal.

■■ Defendant contends that it was error to allow evidence that he had not completed his driver training course at the time of the accident because the effect of this evidence was to inform the jury that he did not have a driver's license. He urges that this evidence was immaterial to the issue of negligence, (*Perry v. Richerson* (1954), 3 Ill. App. 2d 338, 122 N.E.2d 75), and that the introduction of this evidence to show his inexperience as a driver was impermissible and prejudicial. (*Mattero v. Silverman* (1961), 71 N.J. Super. 1, 176 A.2d 270.) In following the general rule that evidence of lack of a driver's license is to be excluded, the court in *Mattero* refused to allow evidence that defendant possessed only a learner's permit. Plaintiffs urge that defendant's testimony that he had not completed his driver training course was relevant in establishing that defendant was an inexperienced driver, and that he did not act with the competence which a reasonable person in his position would have recognized as necessary under the circumstances. Plaintiffs claim that the question of competence is always relevant. (*Bohnen v. Wingereid* (1979), 80 Ill. App. 3d 232, 398 N.E.2d 1204; Restatement (Second) of Torts §299 (1965).) A review of the record discloses that evidence that defendant was an unlicensed driver was not admitted, only that defendant was an inexperienced driver, and we agree with plaintiffs that this was not error. *Bohnen v. Wingereid.*

■■ Finally defendant contends that counsel for both plaintiffs made improper and prejudicial remarks in their closing arguments. Defendant did not object to the remarks of plaintiffs' counsel during closing argument, and has therefore waived this issue on appeal. (*Funk v. Venture Stores, Inc.* (1981), 94 Ill. App. 3d 115, 418 N.E.2d 498.) Defendant also contends that it was error to allow plaintiff Kinsey to argue impeachment and for the court to so instruct the jury when defendant had not been impeached. Defendant made no objection to the

giving of the impeachment instruction at the conference on instructions and has waived this issue as well on appeal. *Finfrock v. Eaton Asphalt Co.* (1976), 41 Ill. App. 3d 1020, 355 N.E.2d 214.

For the reasons set forth herein the judgment of the circuit court is affirmed.

Affirmed.

McGLOON and GOLDBERG, JJ., concur.