E&E HAULING, INC., *et al.*, Petitioners and Cross-Respondents, *v.* THE POLLUTION CONTROL BOARD, Respondent—(The Village of Hanover Park, Respondent and Cross-Petitioner).

Second District No. 82—701

Opinion filed June 15, 1983.—Supplemental opinion filed on denial of rehearing August 3, 1983.

J. Michael Fitzsimmons, State's Attorney, of Wheaton (George J. Sotos, Assistant State's Attorney, of counsel), for appellant County Board of Du Page County.

Thomas W. McNamara, Russell J. Hoover, and Jose M. Sariego, all of Jenner & Block, of Chicago, for appellant E&E Hauling, Inc.

Richard A. Makarski and Michael B. Carsella, both of Chapman & Cutler, of Chicago, for appellant Forest Preserve District of Du Page County.

Joseph V. Karaganis, Russell R. Eggert, and David G. Lichtenstein, all of Karaganis, Gail & White, Ltd., of Chicago, for appellee Village of Hanover Park.

PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

E&E Hauling, Inc., is the operator of a landfill on property owned by the Forest Preserve District of Du Page County commonly known as the "Mallard Lake" site. It, joined with the County Board of Du Page County (County Board) and the Du Page Forest Preserve District, seeks judicial review of a decision of the Illinois Pollution Control Board (PCB) which had reversed a decision of the County Board granting approval of a proposed modification and expansion of the landfill subject to certain conditions. The village of Hanover Park has cross-appealed from that part of the decision of the PCB which remanded the cause for further hearings rather than reversing outright.

The Du Page County Forest Preserve District (District) acquired the 927-acre site in 1956 for recreational purposes. In 1972 the County Board and the District passed a joint resolution empowering the District to operate and contract for the operation of a sanitary landfill on the site, with a goal of improving the site's recreational and scenic value. In 1974 the District contracted with E&E Hauling, Inc. (E&E), a private waste disposal company, to operate the landfill. The Illinois Environmental Protection Agency issued development and operation permits for 1974 and 1975.

The contract was originally for a 10-year period commencing June 1, 1974, with additional two-year extensions at the company's option. In no case was the period of the agreement plus any extensions to exceed 19 years (i.e., past 1993), and the agreement would terminate upon completion of the development of the site (if before 19 years).

Under the agreement the District would receive from E&E an amount equal to 10% of the amount charged by E&E for all waste material received or deposited on the premises during the first 10 years of the contract, with an additional 1% added to the preceding period's royalty for each two-year renewal period. The District would also receive 25% of the amount received by E&E from the sale of material recovered from the waste stream. The District also received the right to dump materials collected from its preserves at the Mallard Lake landfill at no cost. Evidence introduced on administrative review

before the PCB showed that the District has, since the landfill started operating, received over $2 million in royalties and has been collecting royalties at a rate of about $30,000 per month.

The original design of the landfill envisioned a north hill about 200 feet high, with a 90-acre base, and a south hill about 200 feet high with a 65-acre base, along with below-grade excavation and fill. The fill began operating in 1975 and by September 1981 the south hill was filled near the lateral limits of its original design. According to James Andrews, an environmental engineer and consultant to E&E, the projected total life of the landfill at the time of the original permit application was 42 years, but the projection was shortened after operations began because the quantities of refuse going into the fill greatly exceeded original estimates.

In 1979 the District and E&E were opponents in several lawsuits involving operation of the landfill relating to the acceptance of sludge at the site. In April 1981 the suits were settled and dismissed by the parties' agreement. The agreement provided, *inter alia*, that E&E and the District would jointly petition the Illinois Environmental Protection Agency for approval of plans to modify the design of the landfill to an expanded one-hill concept. The District, by ordinance, approved the settlement and proposed modification. The PCB found that the agreement adequately protected the environmental interests of the State of Illinois.

On September 10, 1981, E&E and the District applied to the Illinois Environmental Protection Agency for permission to expand and modify the landfill according to the agreed-on "one-hill concept." On October 27, 1981, the County Board passed an ordinance approving the proposed modification and expansion. The Illinois Environmental Protection Agency scheduled a public hearing on the application for November 18, 1981.

In the meantime the General Assembly passed Senate Bill 172 (also known as Public Act 82—682), effective November 12, 1981, amending the Environmental Protection Act (Ill. Rev. Stat., 1982 Supp., ch. 111½, par. 1039.2), to transfer the responsibility for hearing and approving site location suitability permits for regional pollution control facilities from the E.P.A. to the relevant locality, in this case, the County Board. The statute requires the County Board to conduct a public hearing on the site location application and conditions approval of the application on proof that the proposed site meets certain statutory criteria. The statute also enables interested parties to obtain review of the County Board decision before the PCB. Ill. Rev. Stat., 1982 Supp., ch. 111½, par. 1039.2; Ill. Rev. Stat. 1981, ch.

111½, par. 1040.1.

The County Board held the required public hearing on the application jointly with the Illinois Environmental Protection Agency on February 11, 1982. Jack Knuepfer, Chairman of the Du Page County Board, appointed himself hearing officer, apparently without objection. Most of the County Board members did not attend all of the hearing, but all later received transcripts of the hearing. Under procedural rules employed at the hearing, all persons in attendance were allowed to testify, present evidence, and cross-examine hostile witnesses.

During the hearing Chairman Knuepfer stated that no further testimony or evidence would be taken after the conclusion of the hearing unless he adjourned the hearing to a date specific for the purpose of taking further evidence. He did not do this, and later testified before the PCB that no further public hearings on the application were scheduled. On April 14, 1981, he published a working draft of proposed findings and stipulations recommending approval of the application subject to certain conditions. He submitted the draft findings and stipulations to the County Board finance committee.

The finance committee considered the application at a series of meetings between April 19 and April 27, 1982. According to evidence developed on review before the PCB, Edward Heil, president of E&E, and attorneys for E&E and the District attended these meetings and discussed aspects of the proposed application.

On April 27, 1982, the County Board voted 16-7 to approve the site location for the proposed modified Mallard Lake landfill.

On June 1, 1982, the village of Hanover Park (Village) filed a petition for review of the County Board decision with the PCB. See Ill. Rev. Stat. 1981, ch. 111½, par. 1040.1.

The PCB appointed a hearing officer and ordered the County Board clerk to prepare and certify the record for review. Over objections by petitioners (respondents at the PCB level), the PCB on July 21, 1982, entered an order allowing the Village to conduct limited discovery on the issue whether the proceedings at the County Board level satisfied statutory requirements of fundamental fairness.

The PCB reversed the County Board's site approval decision and remanded for a further public hearing before a panel of elected county officials rather than the County Board. The PCB rested its decision on findings that

> (1) The County Board approval resolution did not sufficiently demonstrate that the applicants had, in the County Board's judgment, met their burden to show that the proposed expan-

sion satisfied the six statutory criteria of section 39.2 of the Environmental Protection Act (Ill. Rev. Stat., 1982 Supp., ch. 111½, par. 1039.2).

(2) The proceedings below, though fairly conducted, were fundamentally unfair because the County Board, whose members were by law also commissioners of the co-applicant District (Ill. Rev. Stat. 1981, ch. 96½, par. 6305), had already passed favorable judgment on the application before the hearing had begun.

The PCB also found that the record certified by the County Board was incomplete in certain respects. Insofar as the original record was incomplete we have concluded that this defect was cured by proceedings at the PCB level, and discuss the issue no further.

The petition and cross-petition to this court followed.

The issues raised by the petition and cross-petition are numerous, but can be grouped into three major areas of inquiry: (1) whether the proceedings at the County Board level was inherently unfair, (2) whether the County Board proceedings were unfairly conducted, (3) whether the County Board erred in finding that the proposed expansion met the requirements of section 39.2 of the Environmental Protection Act.

I

INHERENT UNFAIRNESS

■■ The Village argues that the proceedings at the County Board level were inherently violative of statutory common law and constitutional guarantees of administrative fairness for two reasons: (1) The County Board suffered from a disqualifying conflict of interest, as by statute all members were also commissioners of the District, a co-applicant which stood to gain financially from approval of the proposed expansion; (2) County Board members suffered from a disqualifying bias and prejudice because they had, both as board members and as District commissioners passed favorably on the merits of the application several times before the public hearing had even begun.

Petitioners argue that the Village has waived all of its "fundamental fairness" arguments by not raising them at the County Board level. It appears that the record of the County Board hearing contains only a brief comment by a citizen to the effect that any County Board members that have taken bribes, campaign funds or other gratuities from a landfill contractor should disqualify themselves from voting on the application, and a comment by another citizen that the District stood to gain financially by approval of the application. While we

agree that these comments are insufficient to raise the issues of conflicting duties and bias and prejudice raised before the PCB, we are impelled, owing to the seriousness of the Village's charges, to consider the merits of the issue. The waiver rule is not inflexible and may encompass challenges to the composition of administrative bodies made for the first time on administrative review wherein injustice might otherwise result. *Kendler v. Rutledge* (1979), 78 Ill. App. 3d 312, 318; *Olson v. Department of Registration & Education* (1978), 63 Ill. App. 3d 166, 168.

▮ Also preliminarily, we disagree with petitioners' argument that the PCB improperly allowed the Village to discover and introduce evidence of the County Board's alleged conflict and bias.

The Environmental Protection Act by its terms requires that a hearing on a petition for review be "based exclusively on the record before the county board ***" (Ill. Rev. Stat. 1981, ch. 111½, par. 1040.1(a)), but the spirit and purposes of an enactment will prevail over the literal language if necessary to avoid an unjust or absurd result. (*First National Bank v. Coleman* (1979), 68 Ill. App. 3d 256, 258.) To adopt petitioners' argument could visit unjust results on parties actually victimized by unfair or improper procedures not of record. To shield off-record considerations from judicial review would frustrate the purpose of review since the statute directs the PCB to consider the fundamental fairness of the procedures at the County Board level. We also note that much of the "evidence" obtained by the Village on review before the PCB consists of judicially noticeable matter such as statutes, ordinances, County Board and District resolutions, and Attorney General's opinions. See *Tyrrell v. Municipal Employees Annuity & Benefit Fund* (1975), 32 Ill. App. 3d 91, 98; *King v. Exchange National Bank* (1978), 64 Ill. App. 3d 335, 344.

A

### THE ASSERTED BASES OF DISQUALIFICATION
### (1) CONFLICT OF INTEREST

The Village argues that the conflict of interest arising from County Board members' dual role as adjudicators and commissioners of the co-applicant District violated (a) common law limitations on holding incompatible offices, (b) the Illinois Corrupt Practices Act (Ill. Rev. Stat. 1981, ch. 102, par. 3(a)), (c) constitutional guarantees of due process, and (d) the requirement of "fundamental fairness" section 40.1 in the Environmental Protection Act. We consider each of these possible bases of disqualification in turn.

■ a. *Common law incompatibility.* The Village argues that the Board's action in deciding on the application violated the common law doctrine that an individual may not hold more than one public office "where the duties of either office are such that the holder of the office cannot in every instance, properly and fully, faithfully perform all the duties of the other office." *People ex rel. Myers v. Haas* (1908), 145 Ill. App. 283, 286.

The incompatibility doctrine concerns limits on simultaneous office holding, not the validity of particular decisions made by individuals holding more than one office. In accordance with statute, members of the county board simultaneously became commissioners of the Forest Preserve District. (Ill. Rev. Stat. 1981, ch. 96½, par. 6305.) Even if the common law rule of incompatibility prevented the decision-making process here, this rule would have been overridden by the legislative authorization of dual office holding. *Ahto v. Weaver* (1963), 39 N.J. 418, 423-24, 189 A.2d 27, 30; 1975 Ill. Att'y Gen. Op. S-877.

b. *Corrupt Practices Act.* The Illinois Corrupt Practices Act, which provides generally that a holder of public office interested directly or indirectly in any contract of work may not vote on the matter or receive anything of value as a means of influencing his vote (Ill. Rev. Stat. 1981, ch. 102, par. 3(a)), also does not apply. Although the District and the County Board both stood to gain financially from the modification of the landfill, the Corrupt Practices Act is inapplicable since there is no claim that any member of the County Board or District would gain personally from his act or vote. The Corrupt Practices Act is aimed at the "actual bad faith abuse of power for an *officer's own personal benefit* (and) *** the creation of relationships which carry in them the potential of such abuse ***." (Emphasis added.) *Brown v. Kirk* (1976), 64 Ill. 2d 144, 151; see also *Chicago ex rel. Cohen v. Keane* (1976), 64 Ill. 2d 559, 565.

■ c. *Due process.* The Village next argues that the conduct of the County Board members in passing on an application from the District of which they were automatically members violates due process guarantees against adjudication by one whose personal or institutional interests in the outcome afford a temptation to be less than fully impartial. It maintains that because the District will gain financially from approval of the application the hearing by the County Board members who are also District commissioners inherently violated due process guarantees of neutrality.

The Village, however, slights the threshold question of whether the protections afforded by the due process clauses of Federal and Illinois constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I,

sec. 2) apply to these proceedings at all. We must conclude that they do not, as such, apply. As a municipal creature of the legislature, the Village itself has no due process rights. (*Village of Riverwoods v. Department of Transportation* (1979), 77 Ill. 2d 130, 136.) As the Village brought its petition for review on behalf of its individual citizens, it is necessary also to consider whether the grant of the permit, either in itself or because of its alleged effects, deprived any of these individuals of a protected liberty or property interest. If it did not, due process would not apply. *Meyer v. Niles Township* (N.D. Ill. 1979), 477 F. Supp. 357, 362.

The possible harmful effects of the proposed expansion on citizens' property do not give individual citizens any due process right to a hearing at all on petitioners' application, and thus give them no constitutional right to a fair hearing. (*Landfill, Inc. v. Pollution Control Board* (1978), 74 Ill. 2d 541, 559; *Village of South Elgin v. Waste Management of Illinois, Inc.* (1978), 62 Ill. App. 3d 815, 821; *White Fence Farm, Inc. v. Land & Lakes Co.* (1981), 99 Ill. App. 3d 234, 243-44; see also *People v. Pollution Control Board* (1983), 113 Ill. App. 3d 282, 297-98.) Nor do the notice and hearing provisions of the new Environmental Protection Act bring any of these citizens within the protections of due process. It is true that the new section conditions the grant of a permit on specific criteria and affords persons certain rights to participate in a hearing. It provides for notice to "owners of all property within 250 feet in each direction of the lot line of the subject property," provides that any person may file a written comment with the County Board concerning the appropriateness of the proposed site, and provides for at least one public hearing, on due notice, which shall develop a record sufficient to form the basis of appeal of the decision of the County Board. (Ill. Rev. Stat., 1982 Supp., ch. 111½, pars. 1039.2(b), (c), (d).) However, the protection of proeprty under due process is "a safeguard of the security of interests that a person has already acquired in specific benefits." (*Board of Regents v. Roth* (1972), 408 U.S. 564, 576, 33 L. Ed. 2d 548, 560, 92 S. Ct. 2701, 2708.) Although the statute gives all persons a right to a hearing before the grant of a permit application, this does not create a property right where, it has been held, none existed. At least from the point of view of these third parties, decisions on the siting of proposed landfills are essentially matters of public policy, not specific benefits that State law has conferred on individuals. See *Landfill, Inc. v. Pollution Control Board* (1978), 74 Ill. 2d 541, 559; *Wallis v. Blue* (N.D. Ga. 1967), 263 F. Supp. 965.

We thus conclude that neither the Village nor any of its citizens

have any constitutionally protected interest in the continued nonexistence of a landfill (or expansion) on another's property, and thus that the grant of the permit in itself does not trigger the application of due process guarantees of fairness. The County Board's decision cannot, therefore, be invalidated on this ground.

■ d. *Statutory fundamental fairness.* Although we have concluded that the Village and its citizens are not entitled to a fair hearing by constitutional guarantees of due process, we hold that the Environmental Protection Act gives them the right to insist that procedures at the County Board level comport with due process standards of fundamental fairness. Section 40.1(b) of the Act provides that, in reviewing the grant of a landfill permit the PCB "shall hear the petition in accordance with the terms of subsection (a) of this Section ***." (Ill. Rev. Stat. 1981, ch. 111½, par. 1040.1(b).) Subsection (a) directs that "[i]n making its orders and determinations," the PCB "shall include in its consideration *** the *fundamental fairness* of the procedures used by the county board ***." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 111½, par. 1040.1(a).) "Fundamental fairness" has been directly equated with "due process." (*Lassiter v. Department of Social Services* (1981), 452 U.S. 18, 24, 68 L. Ed. 2d 640, 648, 101 S. Ct. 2153, 2158; *In re D.M.D.* (1972), 54 Wis. 2d 313, 318, 195 N.W.2d 594, 597.) We therefore hold that the conflict of interest involved here supported the PCB's finding of disqualifying bias if it violated standards of adjudicative due process.[1]

■ It is difficult to conclude that a procedure under which the hearing body consists of the same people who also comprise the body applying for the permit can be fundamentally fair. It is not true as petitioners have argued that fundamental fairness is violated only where the adjudicator's pecuniary interest in a case is a personal one. Rather "the principle of disqualification applies even if the pecuniary interest is only an indirect outgrowth of public official's desire to protect official funds." (*Meyer v. Niles Township* (N.D. Ill. 1979), 477 F. Supp. 357, 362. See also *Ward v. Village of Monroeville* (1972), 409 U.S. 57, 34 L. Ed. 2d 267, 93 S. Ct. 80.) In *Ward*, defendant's due process (fundamental fairness) rights were violated by his trial, for a traffic offense, before the village mayor as, although the mayor did not benefit personally from convictions, a substantial portion of the

---

[1]For reasons discussed elsewhere in this opinion (see I(A)(2)), we hold that the County Board's decision to grant or deny the permit application was adjudication, rather than rule making, which leads to our conclusion that the requirement of "fundamental fairness" in the statute incorporates standards of adjudicative, rather than legislative, due process.

village revenues were derived from fines and costs imposed by the mayor's court. Similarly in *Meyer*, the court held a panel of township supervisors disqualified from conducting the hearing and from deciding on plaintiff's eligibility for public aid because township funds were the source of the payments in issue. In *United Church of the Medical Center v. Medical Center Com.* (7th Cir. 1982), 689 F.2d 693, 699-700, the court held that the Commission was disqualified from presiding over proceedings involving title to the appellant's property because if the Commission found a certain way, title to the property, along with any proceeds from a subsequent sale would revert to the Commission. We think that the above principles apply here. The Board and District are distinct entities statutorily, but they consist of the same people and the institutional pecuniary pressures on those people are analytically similar to those in the above cited cases. The royalty revenue involved is undeniably substantial. Under these circumstances principles of fundamental fairness lead to the conclusion that the County Board suffered from a disqualifying conflict of interests.

(2)

BIAS AND PREJUDICE

The PCB held that the County Board members were disqualified from hearing the permit application because they had prejudged the merits of the application before the hearing had begun. Arguing in support of this finding, the Village points out that before receiving any evidence according to the procedures of section 39.2, Board members had already (1) in their role as District commissioners, passed an ordinance approving the proposed expansion and applied to the Illinois Environmental Protection Agency, and later the County Board, for permission to go ahead with the expansion, and (2) in their role as the County Board, adopted an ordinance approving the proposed expansion. This ordinance of October 27, 1981, noted and evidently accepted the District's claims that the proposed modification of the Mallard Lake landfill would "improve [the site's] final use as a scenic and recreational facility" and "improve the environmental qualify of the site" by restricting the fill to "areas out of the flood plain, and areas of favorable geological conditions ***." Petitioners argue that the Board's actions in conducting a full public hearing and bringing the matter to a vote in which seven Board members dissented from the permit grant demonstrate that the Board members approached the application decision with open minds despite any indications of prejudgment.

The parties disagree over the proper legal test for whether Board members suffered from a disqualifying bias and prejudice. Petitioners, relying on the standard used in administrative rule making proceedings, maintain that the PCB could find disqualifying bias only upon a clear and convincing showing that Board members had unalterably closed minds on matters critical to the disposition of the application. (See *Association of National Advertisers, Inc. v. F.T.C.* (D.C. Cir. 1979), 627 F.2d 1151, 1154, *cert. denied* (1980), 447 U.S. 921, 65 L. Ed. 2d 1113, 100 S. Ct. 3011.) The Village, characterizing the Board's decision under section 39.2 as adjudication, argues that the PCB could disqualify any Board member, or the Board as a whole if a disinterested observer might conclude that he, or it, had in some measure adjudged the facts as well as the law of the case in advance of hearing it. See *Cinderella Career & Finishing Schools, Inc. v. F.T.C.* (D.C. Cir. 1970), 425 F.2d 583, 591.

■ To decide whether the County Board proceedings were inherently unfair because of bias and prejudice, we must first decide how to characterize these proceedings. We conclude that in hearing and deciding on petitioners' application the Board was engaging in adjudication and that the *Cinderella* standard thus applies to the question of whether it suffered from a disqualifying bias and prejudice.

While the line between adjudication and rule making "may not always be a bright one," the basic distinction is one "between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other." (*United States v. Florida East Coast Ry. Co.* (1973), 410 U.S. 224, 245, 35 L. Ed. 2d 223, 239, 93 S. Ct. 810, 821.) Under section 39.2 the Board's decision on the grant or denial of a permit turns on its resolution of disputed fact issues, whether the particular landfill, or expansion, for which the permit is sought meets the specific factual criteria set out in section 39.2 of the Act. The facts that the Board relies on are developed primarily by the immediate parties rather than acquired through the Board's own expertise.

Our supreme court has held that the decision whether to grant a variance from an environmental regulation is quasi-adjudicatory, although the imposition of conditions on the variance is rule making. (*Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 289-90. See also *Environmental Protection Agency v. Pollution Control Board* (1981), 86 Ill. 2d 390, 400; *Willowbrook Development Corp. v. Pollution Control Board* (1981), 92 Ill. App. 3d 1074, 1081-82.) As the factual criteria involved in the County Board's decision under section

39.2 are not substantially broader than those in the statutes involved in the above-cited cases, we adopt a similar rule here.

Although the standard for disqualifying bias enunciated in *Cinderella* is, as that opinion notes, grounded in due process (425 F.2d 583, 591), our conclusion that the statutory requirement of "fundamental fairness" incorporates due process standards of fairness by reference enables us to state that the PCB's finding of disqualifying bias and prejudice on the part of the County Board will be upheld if it can be said that the Board had in some measure adjudged the facts of the permit application in advance of hearing it.

Before hearing the application, the Board plainly had more than a mere predisposition in favor of landfill development generally. It had officially and explicitly endorsed the proposed expansion, largely on grounds, such as necessity and environmental and geological safety, that it would later have to consider in passing on the application. The Board's prejudgment, though inadvertent in the sense that Board members had not yet become charged with the duty of adjudication when the Board passed its resolution, was straightforward and substantial. Moreover, it created an appearance of unfairness which could only have been strengthened by Board members' role as commissioners of the co-applicant District. It is elementary that administrative procedures should provide both fairness and the appearance of fairness. *Amos Treat & Co. v. S.E.C.* (D.C. Cir. 1962), 306 F.2d 260, 267.

We find that the actions of the County Board adequately demonstrate a disqualifying bias and prejudgment of the merits of the application. It is not fatal to this conclusion that several Board members eventually voted against the application. The Board's unequivocal public pronouncements in favor of the proposed expansion amounted to a sufficient prejudgment of the merits of the case to warrant the finding of disqualifying bias. See *Appeal of Lathrop* (N.H. 1982), 444 A.2d 505; *Staton v. Mayes* (10th Cir. 1977), 552 F.2d 908; *Cinderella Career & Finishing Schools, Inc. v. F.T.C.* (D.C. Cir. 1970), 425 F.2d 583.

### (B)

#### THE RULE OF NECESSITY

■ Petitioners argue that even if the County Board suffered from a disqualifying conflict of interest as bias, it acted properly in hearing their application because by law it was the only tribunal empowered to do so. Thus, they argue, the Board's decision cannot be overturned for inherent unfairness because the "rule of necessity"

made any otherwise disqualifying bias acceptable.

The "ancient rule of necessity" requires that an otherwise disqualified adjudicator hear a case if the case could not be heard otherwise. (*United States v. Will* (1980), 449 U.S. 200, 211-16, 66 L. Ed. 2d 392, 404-06, 101 S. Ct. 471, 479-81.) Disqualification will not be permitted to destroy the only tribunal with power in the premises. *Brinkley v. Hassig* (10th Cir. 1936), 83 F.2d 351, 357; *First American Bank & Trust Co. v. Ellwein* (N.D. 1974), 221 N.W.2d 509, 515-17, *cert. denied* (1974), 419 U.S. 1026, 42 L. Ed. 2d 301, 95 S. Ct. 505.

We agree with petitioners that this is, in fact, a case of necessity—that their application had to be heard by the County Board or not at all. Section 39.2 of the Act provides:

"Sec. 39.2(a) The *county board* of the county or the governing body of the municipality, as determined by paragraph (c) of Section 39 of this Act, shall approve the site location suitability for such new regional pollution control facility ***:

* * *

(c) An applicant shall file a copy of its request with the *county board* of the county or the governing body of the municipality in which the proposed site is located. ***

* * *

(f) The siting approval, procedures, criteria and appeal procedures provided for in this Act for new regional pollution control facilities shall be the *exclusive* siting procedures and rules and appeal procedures for such facilities. Local zoning or other local land use requirements shall not be applicable to such siting decisions." (Emphasis added.) Ill. Rev. Stat., 1982 Supp., ch. 111½, par. 1039.2.

Relatedly, section 39 of the Act, dealing with the Illinois Environmental Protection Agency's role in the permit process, requires site location to be approved by "the County Board of the county if in an unincorporated area *** in accordance with Section 39.1 of this Act." Ill. Rev. Stat. 1981, ch. 111½, par. 1039(c).

The statute unambiguously makes the County Board the sole body empowered to grant or deny permits to locate landfills on unincorporated land within the county. We therefore hold that the PCB did not act in accordance with the statute in remanding this cause to an *ad hoc* panel of elected county officials. These officials simply had no authority to hear the matter.

We also reject the Village's argument that the County Board could have transferred its obligation to decide to another unit of local government pursuant to article VII, section 10 of the Illinois Constitu-

tion, which provides that units of local government may agree to "exercise, combine, or transfer any power or function, in any manner not prohibited by law or by ordinance," or the Intergovernmental Cooperation Act (Ill. Rev. Stat. 1981, ch. 127, par. 741 *et seq.*), which is designed to facilitate cooperation among units of local government. The constitutional provision does not apply to this case because, for the reasons we have given, the suggested transfer is prohibited by the terms of the Environmental Protection Act. The same objection is decisive against the Intergovernmental Cooperation Act, which, additionally, appears limited to joint exercises and not outright transfers of power. Furthermore, both article VII, section 10 and the Intergovernmental Cooperation Act appear directed only at facilitating purely voluntary, not court-ordered, sharing of local government power. We conclude that they do not apply here and therefore do not provide an alternative to adjudication by the County Board.

As this is apparently a true case of necessity, the existence of disqualifying biases found by the PCB (and this court) will not entitle the Village to reversal of the County Board's decision for inherent unfairness unless there is some reason why the rule of necessity shall not apply to this case.

The Village correctly asserts that constitutional requirements of due process will prevail over legislatively created necessity. (*Sharkey v. Thurston* (1935), 268 N.Y. 123, 127, 196 N.E. 766, 767; *First American Bank & Trust Co. v. Ellwein* (N.D. 1974), 221 N.W.2d 509, 517; see, *e.g., Gibson v. Berryhill* (1973), 411 U.S. 564, 36 L. Ed. 2d 488, 93 S. Ct. 1689.) We have, however, held these constitutional protections inapplicable to this case. The right of the Village and its citizens to a hearing arises solely from the Environmental Protection Act, which itself has created the necessity involved here by vesting sole decision making power in the County Board. Thus the Village cannot prevail on its inherent unfairness claims unless it can be said that the statute somehow limits or forbids the customary operation of the rule of necessity. See *Sharkey v. Thurston* (1935), 268 N.Y. 123, 127-28, 196 N.E. 766, 768.

We hold, however, that the relevant provisions of the Environmental Protection Act do not abolish or restrict the rule of necessity and that the County Board, therefore, despite the otherwise disqualifying biases, properly heard the case.

The statute does not mention disqualification directly and there is certainly nothing in it which explicitly limits operation of the rule of necessity. We have held that the provision for "fundamental fairness" allows the PCB to find that one or more Board members suffered

from a disqualifying bias, but that part of the statute does not at all indicate that the legislature intended to reverse the usual rule that the principle of disqualification must yield to the principle of necessity. (*Nellius v. Stiftel* (Del. 1978), 402 A.2d 359, 361-62; *Eismann v. Miller* (1980), 101 Idaho 692, 696, 619 P.2d 1145, 1149; *State ex rel. Yuhas v. Board of Medical Examiners* (1959), 135 Mont. 381, 339 P.2d 981.) In part because the rule of necessity is so well-established, courts will not lightly hold that statutes have, by implication, limited its reach. (*United States v. Will* (1980), 449 U.S. 200, 216, 66 L. Ed. 2d 392, 406, 101 S. Ct. 471, 481; *Atkins v. United States* (U.S. Ct. Cl. 1977), 556 F.2d 1028, 1039.) This reluctance is also in part grounded on considerations of policy and equity. Foremost among these is the realization that to disqualify the only tribunal capable of hearing a case would deny a litigant a procedural right to be heard and possibly a substantive right under the relevant statute or law. (*New Jersey State Bar Association v. New Jersey Association of Realtor Boards* (1972), 118 N.J. Super. 203, 209, 287 A.2d 14, 18; *Nellius v. Stiftel* (Del. 1978), 402 A.2d 359, 361-62; *United States v. Will* (1980), 449 U.S. 200, 217, 66 L. Ed. 2d 392, 407, 101 S. Ct. 471, 481.) Here, it is true, petitioners would not necessarily be deprived of any constitutional rights, nor suffer grievous loss, if their application could not be heard. Nonetheless, the statute gives them a right to be heard on the application and the right to approval of the application upon a sufficient showing that they have met the statutory prerequisites. We must give considerable respect to petitioners' statutory right to be heard as courts have recognized that, absent due process claims, a biased adjudication is preferable to none at all. (*First American Bank & Trust Co. v. Ellwein* (N.D. 1974), 221 N.W.2d 509, 515; *New Jersey State Bar Association v. New Jersey Association of Realtor Boards* (1972), 118 N.J. Super. 203, 209, 287 A.2d 14, 18.) The corollary of this right to be heard is the general obligation of tribunals to decide cases properly before them. (118 N.J. Super. 203, 209, 287 A.2d 14, 18.) Finally, courts have realized that to leave gaps in the decision making process by excluding certain cases could frustrate fulfillment of policies underlying the laws under which the cases arise. (*Sharkey v. Thurston* (1935), 268 N.Y. 123, 127-28, 196 N.E. 766, 768; *State ex rel. Yuhas v. Board of Medical Examiners* (1959), 135 Mont. 381, 339 P.2d 981, 985.) Although this reasoning is most persuasive where disqualification of the sole decision maker would shelter improper conduct from discipline or allow wrongs to go unremedied, we believe it is applicable here. The Environmental Protection Act, by conditioning landfill approval on a finding of reasonable public necessity (Ill. Rev. Stat.,

1982 Supp., ch. 111½, par. 1039.2(a)(i) and giving applicants the right to approval upon satisfaction of certain criteria, evidences a legislative policy in favor of development of regional pollution control facilities insofar as they contribute to meeting public waste disposal needs.

We note that the District and E&E became co-applicants for site location approval before the responsibility to decide on their application was transferred by statute to the County Board. We would be presented with a different case had the District entered into an agreement and application after the statutory change—*i.e.*, after District commissioners were aware that they would later, as County Board members, decide on the application. To invoke the rule of necessity under such circumstances would create genuine injustice and would effectively foster, not merely create genuine injustice and would effectively foster, not merely tolerate, biased adjudication. In such a situation the applicants' right to a hearing and the County Board's obligation to decide would be wholly artificial and unworthy of respect. We would not be willing to allow the rule of necessity to facilitate deliberate manipulation of the permit procedure in a way that could empty that procedure of its intended meaning. We repeat, however, that such circumstances are not presented by the facts of this case.

In sum, we hold that, under the rule of necessity, the County Board properly heard petitioners' application even though it suffered from otherwise disqualifying biases and conflicts of interest. We must therefore reject the Village's "inherent fairness" arguments, and we hold that the PCB erred in reversing on these grounds.

## II

### Fairness As Conducted

The Village argues that the proceedings at the County Board level, even if not inherently unfair were conducted unfairly in two basic respects.

First, according to the Village, the County Board did not fulfill its statutory obligation to conduct a "public hearing" on the application because most County Board members attended the February 11 hearing selectively or not at all, abdicating their responsibility to County Board Chairman Jack Knuepfer, who, without legal authorization, appointed himself hearing officer.

No real objection was made at the hearing itself to these alleged irregularities, even though (in contrast to the problems of inherent bias and conflict of interest discussed above) they might easily have

been dealt with at the time. Moreover, there is nothing to indicate that Knuepfer's self-appointment or the failure of most Board members to attend the hearing in person prejudiced opponents of the proposed expansion. There is no suggestion, for instance, that opponents of the expansion were not given ample opportunity to testify and cross-examine petitioners' witnesses at the hearing. The Village, in fact, makes no allegations of prejudice and thus provides us here with no ground for reversal. *Dodson v. National Transportation Safety Board* (7th Cir. 1981), 644 F.2d 647, 652.

Questions of waiver and lack of prejudice aside, we are satisfied that the County Board heard the application in accordance with section 39.2 of the Environmental Protection Act.

The Village concedes that, at a minimum, the entire Board received full transcripts of the February 11 hearing. Thus, although most of them were not present at the hearing itself, all Board members "heard" the case. Fundamental fairness did not require their personal attendance. (*Homefinders, Inc. v. City of Evanston* (1976), 65 Ill. 2d 115, 128-29.) Under these circumstances Knuepfer's role as "hearing officer" was ministerial and of no consequence. We conclude that the County Board's conduct of the hearing itself did not violate the statutory requirements of a public hearing and fundamental fairness.

■ Second, the Village contends that the proceedings at the County Board level were poisoned by improper *ex parte* contacts, after the hearing but before the decision to approve the proposed expansion, between the Board and E&E. According to the Village, these contacts violated not only the statutory guarantee of fundamental fairness but also the requirement that the County Board reach its decision on the record after a public hearing, as the real decision on the permit application, the Village maintains, was reached behind the scenes by the County Board and E&E.

After the February 11 hearing, the petitioners' application went to the County Board's finance committee for further deliberation. On administrative review, the Village introduced minutes of finance committee meetings for April 19, 21, 23, 26 and 27, 1982. These minutes reveal that:[2]

---

[2]Our earlier conclusion that the PCB did not err in considering off-record evidence of procedural unfairness at the County Board level applies with particular force to the matter of *ex parte* contacts, which, by definition, take place outside of the administrative hearing and record. To the extent that such *ex parte* contacts are improper, they are improper precisely *because* they are outside the public record. To hold that the PCB (or this court) may not consider the *ex parte* contacts involved here

1. On April 19, the committee met with Edward Heil (president of E&E) and counsel for E&E present. Mr. Heil and counsel for E&E reviewed, with the committee, the list of "stipulations" suggested for approval of the one-hill concept for the fill. Counsel for E&E complained that several stipulations would be impossible to meet and that several others were either contrary to or covered by the June 1981 court decree.

2. On April 21, the committee met, with Edward Heil and counsel for E&E again present. The committee discussed, along with counsel for E&E, whether the County Board could impose certain stipulations that might in effect alter the terms of the 1981 agreement between E&E and the District. The committee also reviewed the second working draft of the proposed stipulations "with input from the Forest Preserve and the landfill operator." Chairman Knuepfer "agreed to revise the document, incorporating some of the ideas presented."

On April 23, with Heil and counsel for E&E present, the committee agreed to certain modifications of the conditions. Those present received a working draft of the conditions ("stipulations") "as negotiated by attorneys for all parties."

On April 26, with Heil and counsel for E&E present, the committee heard an explanation of landfill liability from a representative of Waste Management, Inc., and, with input from Mr. Heil, decided not to require E&E to post a surety bond. On April 27, 1982, the committee, with counsel for E&E present, reviewed the text of the approval stipulations as amended on April 26.

Richard Utt, superintendent of construction and development for the District, testified on administrative review that at the April 23 meeting, which he attended, the committee, counsel for E&E, and counsel for the District reviewed the conditions; he declined to characterize the meeting as "negotiation."

There is nothing in the record indicating attendance at these meetings by any Village officers or citizens.

The PCB rejected the Village's argument that the alleged *ex parte* contacts provided grounds for overturning the County Board's decision. The PCB reasoned that because County Board members, as District commissioners, necessarily had prior contacts with E&E, "*ex*

---

because they are not part of the record certified by the County Board would immunize such contacts from review because of the very characteristic that makes them improper, thereby creating a wrong with no remedy and vitiating the requirement of a public hearing. We note that the PCB's evidentiary hearing on this matter on administrative review is hardly unprecedented. See, *e.g., PATCO v. Federal Labor Relations Authority* (D.C. Cir. 1982), 685 F.2d 547.

*parte* contact" was, in the context of this case, a meaningless term. We cannot accept this characterization.

The meetings in question here occurred before the County Board had made its decision. Although some prior contact between the Board members (as District commissioners) was inevitable, at least before the Board received statutory authority to decide on the application, this would not excuse unnecessary and avoidable contacts, before the decision on the permit application, between the adjudicator and the applicant. The case law condemns such *ex parte* contacts because they (1) violate statutory requirements of public hearings, and concomitant rights of the public to participate in the hearings, (2) may frustrate judicial review of agency decisions, and (3) may violate due process and fundamental fairness rights to a hearing. The impropriety of *ex parte* contact in administrative adjudication is well established. *United States Lines v. Federal Maritime Com.* (D.C. Cir. 1978), 584 F.2d 519, 536-42; *PATCO v. Federal Labor Relations Authority* (D.C. Cir. 1982), 685 F.2d 547, 564-66; *Sangamon Valley Television Corp. v. United States* (D.C. Cir. 1959), 269 F.2d 221; *North Federal Savings & Loan Association v. Becker* (1962), 24 Ill. 2d 514, 520; *Fender v. School District No. 25* (1976), 37 Ill. App. 3d 736, 745.

Petitioners argue that the discussions at issue were not genuine *ex parte* contacts because the finance committee meetings were open to the public. However, there was no notice that the application would be discussed or evaluated after the public hearing. Board Chairman Knuepfer told people at the public hearing that there would be no further public hearings on the application; he himself did not consider the finance committee hearings public. The lack of notice to the public that the landfill would be discussed at the finance committee suffices to characterize those meetings as *"ex parte,"* whether or not they were truly secret. Members of the public should not have to depend on having the good fortune to stumble onto such unadvertised discussions of a matter which is supposed to be the subject of public hearings.

Although the *ex parte* contacts in this case were improper—and certainly ill-advised—the question remains whether they require reversal of the County Board's decision. In enforcing the proscription against *ex parte* contacts, a court must consider

> "whether, as a result of improper ex parte communications, the agency's decisionmaking process was irrevocably tainted so as to make the ultimate judgment of the agency unfair, either to an innocent party or to the public interest that the agency was obliged to protect. In making this determination, a number of

considerations may be relevant: the gravity of the ex parte communications; whether the contacts may have influenced the agency's ultimate decision; whether the party making the improper contacts benefited from the agency's ultimate decision; whether the contents of the communications were unknown to opposing parties, who therefore had no opportunity to respond; and whether vacation of the agency's decision and remand for new proceedings would serve a useful purpose. Since the principal concerns of the court are the integrity of the process and the fairness of the result, mechanical rules have little place in a judicial decision whether to vacate a voidable agency proceeding. Instead, any such decision must of necessity be an exercise of equitable discretion." *PATCO v. Federal Labor Relations Authority* (D.C. Cir. 1982), 685 F.2d 547, 564-65.

A court will not reverse an agency's decision because of improper *ex parte* contacts without a showing that the complaining party suffered prejudice from these contacts. *Fender v. School District No. 25* (1976), 37 Ill. App. 3d 736, 745.

We conclude that the Village has failed to make the required showing of prejudice, and that reversal is not mandated. The record, including the evidence gathered by the Village on administrative review, fails to show that the *ex parte* contacts between the Board and E&E influenced the Board's decision on approval of the proposed expansion (as opposed to the imposition of conditions which have not been challenged on review). Petitioners did not, apparently, introduce evidence or argument on the desirability of the proposed expansion of the Finance Committee meetings. The record also indicates that by the time these meetings took place, the Board, though it had not yet formally approved the application, had essentially made up its collective mind to approve the proposed expansion and had moved to consideration of the conditions. The County Board's decisionmaking process, insofar as its results are being challenged on review, has not been shown to have been "irrevocably tainted" by the contacts in question, and reversing and remanding its approval decision would appear neither appropriate nor productive. See *PATCO v. Federal Labor Relations Authority*, (D.C. Cir. 1982), 685 F.2d 547, 565-66; *Neuberger v. City of Portland* (1980), 288 Ore. 585, 589, 607 P.2d 722, 725.

We conclude that any unfairness in the proceedings at the County Board level does not call for reversal of the Board's decision.

### III

■ We then reach the question whether the evidence taken at

the public hearing before the County Board supports the site approval decision.

The statute provides:

"(a) The county board of the county or the governing body of the municipality *** shall approve the site location suitability for such new regional pollution control facility only in accordance with the following criteria:

(i) the facility is necessary to accommodate the waste needs of the area it is intended to serve;

(ii) the facility is so designed, located and proposed to be operated that the public health, safety and welfare will be protected;

(iii) the facility is located so as to minimize incompatibility with the character of the surrounding area and to minimize the effect on the value of the surrounding property;

(iv) the facility is located outside the boundary of the 100 year flood plain as determined by the Illinois Department of Transportation, or the site is flood-proofed to meet the standards and requirements of the Illinois Department of Transportation and is approved by that Department;

(v) the plan of operations for the facility is designed to minimize the danger to the surrounding area from fire, spills, or other operational accidents; and

(vi) the traffic patterns to or from the facility are so designed as to minimize the impact on existing traffic flows." Ill. Rev. Stat., 1982 Supp., ch. 111½, par. 1039.2.

At the outset, we conclude that the standard of review is the manifest weight of the evidence, although no specific standard is provided in the statute. This would give the County Board's findings the respect customarily accorded fact findings of administrative agencies. See *Wells Manufacturing Co. v. Pollution Control Board* (1978), 73 Ill. 2d 226; *Nolting v. Civil Service Com.* (1955), 7 Ill. App. 2d 147, 148.

(A)

Roscoe Craft, an environmental and regulatory consultant, testified that three of the four waste disposal facilities in Du Page County have life expectancies of 10 years each, and that the other has a two-year life expectancy. Thus, without new facilities or expansion of present ones, all waste disposal facilities in the county will have reached capacity by approximately the time the present Mallard Lake landfill is completed. To Craft's knowledge, no new facilities were per-

mitted or about to be opened in Du Page County. In Craft's opinion the proposed expansion was necessary to accommodate the waste needs of the Du Page County area.

James Andrews, a consulting environmental engineer engaged by E&E to prepare the permit application, testified that the projected life of the fill as presently set up was less than originally believed owing to the unexpectedly large quantities of refuse going into the fill. He estimated that the proposed expansion would lengthen the life of the fill by about seven years. Allen Kracower, an urban planner and landscape architect, estimated that the landfill as modified would operate until about the year 2000. William A. McCann, a real estate appraiser, consultant and broker, stated that in his opinion the proposed expansion would serve the need for available landfill sites within the region. None of the above testimony was rebutted or impeached.

On this record the County Board was not in error in finding that petitioners met their burden to show that the facility was necessary to accommodate the waste needs of the area. The use of "necessary" in the statute does not require applicants to show that a proposed facility is necessary in absolute terms, but only that the proposed facility is "expedient" or "reasonably convenient" *vis-a-vis* the area's waste needs. (*Foster & Kleiser, Division of Metromedia, Inc. v. Zoning Board of Appeals* (1976), 38 Ill. App. 3d 50, 53; *Illinois Bell Telephone Co. v. Fox* (1949), 402 Ill. 617, 631.) It would be unreasonable to require petitioners to prove that every other potential landfill site in the region is unsuitable; such a construction would prevent any landfill development if more than one suitable site could be found. This construction of the statute should be avoided as unworkable and implausible. *Illinois Bell Telephone Co. v. Fox* (1949), 402 Ill. 617, 631.

### (B)

The Village argues that the second criterion, the protection of the public health, safety and welfare, was not satisfied. The Village relies primarily on testimony that the proposed expansion does not adequately deal with the potential seepage of contaminated liquid (leachate) from the landfill to the surrounding environment (particularly the water supply of neighboring residential areas).

Richard Utt testified that underlying the landfill were "relatively impermeable soils of glacial origin." He stated that the sand and gravel bodies present are minor and there is no indication that they provided pathways for rapid leachate migration into surrounding ground or surface water. James Andrews also testified that the geo-

logical conditions at the fill are "primarily glacial hills and clay soils" which are by and large "extremely impermeable" materials.

Andrews also testified that the hill involved in the proposed expansion is surrounded by a series of monitoring wells at approximately the three levels of geological formation comprising the landfill, and that these wells are periodically monitored to assure that the hill is operating in an environmentally sound manner. Additionally, the landfill has systems in place for the removal of contaminants if there is contamination of the water at the base of the landfill. Andrews testified that according to reports made from time to time on the nature of the material in the monitoring wells, there has been no migration of leachate or other dangerous substance from the landfill site. Andrews also stated that modification of the fill, as proposed, would allow the removal of a portion of the original design "from areas where the geologic conditions were not particularly favorable for landfill development" and the removal of parts of the fill from the flood plain. In his opinion the one-hill concept was safer, from engineering and safety viewpoints, than the original two-hill concept.

Andrews also stated that the site would cause no contamination, but that the leachate collection system would allow withdrawal of contaminants from the base of the fill if any accumulated there. There would, however, have to be some system for disposing of contaminated materials from the site.

In the opinion of Andrews and that of Kracower the proposed expansion was designed, located and proposed to be operated so that the public health, safety and welfare would be protected.

Petitioners also submitted a "Geology and Hydrology Report" on the proposed expansion. The report detailed results of various tests on the landfill site and conceded that "very little is clear regarding the movement direction of groundwater," although the flow was most likely northeasterly. A determination of the direction of groundwater flow was not "considered critical, as the overall body of groundwater moves *** at extremely low rates." There was no evidence of continuity of the permeable layers in the uppermost (first) interglacial environment, and some probability of lateral continuity within the middle (second) interglacial environment. The third interglacial environment feeding the bedrock aquifer (and the local drinking water) was thought to be widely continuous; pollution, however, was not deemed probable at this level.

The report estimated that with some liquids present the landfill could stabilize biologically and chemically in as little as five to 10 years; without liquid, stabilization might not begin for 20 years or

more.

The probability of contaminants reaching the bedrock aquifer, and therefore of reaching drinking water wells recorded for this area, was "extremely low" because the large "fill area" and the second interglacial environment protected the aquifer, with more than 10 feet between any landfill excavation trench and the second interglacial environment. Furthermore, there was no lateral outlet to the surface at lower elevations for at least a two-mile radius around the site.

Small amounts of water were recorded in several test borings at the site, chiefly at lower levels. The volume percentage of liquids in wastes received at the fill from July 1, 1979, to July 1, 1980, was 44% or less. With the final cover in place, no surplus moisture will infiltrate through final cover.

Calculations described in the report indicated that it would take over 2,500 years for fluid to reach the lower interglacial environment feeding the bedrock aquifer. Leachate was expected to travel "primarily downward."

The report concluded that the overall geology of the fill was excellent for landfill purposes, as over 10 feet of impermeable material separated the landfill from the surrounding environment, and the flow of leachate could be predicted and monitored. Whatever the direction of leachate flow, several hundred years would have to elapse before landfill fluid could leave the site.

Dr. Robert Ginsburg, research director and chemist/toxicologist for Citizens for a Better Environment, testified against the proposed expansion. He contended that boring logs relied on in the Hydrology and Geology Report indicated the possible presence of sludge, septic wastes, and other substances. He disputed the report's conclusion that a substantial separation would exist between the fill trench and the aquifer, arguing that because, "according to a DuPage County engineer," the water table in the area varied from 2.5 to 45 feet below ground surface, at some points there "could be clear connections to the first aquifer." He contended further that the boring logs in the report cast doubt on the report's conclusion that this barrier was highly impermeable, as several of these borings encountered water, sand and/or gravel. Calculations of containment time in the report were overly optimistic, Ginsburg argued, because they were based on erroneous assumptions about the width of the barrier between the fill and the aquifer.

A letter from Richard Utt to the District's counsel criticized Ginsburg's reading of the report, indicating that Ginsburg's estimate of the possible water table level was not related to information about the

landfill site itself and was undercut by the actual data provided by investigations. The findings of sand, gravel and water, as recorded by boring logs were insignificant as water found at higher elevations was the result of precipitation and would be trapped at the higher elevations by impermeable layers below.

There was conflicting testimony over whether E&E had installed the original leachate collection system as required. The County Board concluded that much of the original leachate collection system was never put in place.

Despite "reservations" and "concerns," the County Board concluded that the proposed expansion met the second criterion. The PCB noted the County Board resolution's negative tone and observed that certain conditions imposed by the County Board were "related to curing the County's concerns"; and as the County had not explained "the reasoning behind its imposition of these conditions as they relate to this criteria [sic]," the conclusions and conditions of the County Board "must fall." Thus, the PCB appears to state, not that the County Board's finding was against the manifest weight of the evidence, but that the County had not supported its findings or conclusions adequately in the resolution.

The petitioners' evidence sufficiently supports the County Board's conclusion that because the land underlying the fill was extraordinarily stable geologically, there was slight danger of leachate migration into neighboring water supplies. The studies noted and discussed in the hydrology and geology report indicated that there was little danger of leachate migration; petitioners' evidence was really the only evidence put forth on this issue. The County Board could discount Dr. Ginsburg's testimony against the proposed expansion inasmuch as it was not based on any direct study or knowledge of the site and consisted mostly of questioning the state of scientific or public information about the landfill. Even if the report's estimates of containment time are overly optimistic they would have to be greatly wide of the mark or virtually lacking in credibility to compel a conclusion that the County Board wrongly found that the second criterion had been met.

Conditions 1, 2, and 4 set by the County Board, though not, in our opinion, essential to upholding the County Board's finding, are reasonably related to ensuring that the public health, safety and welfare are protected. These conditions require the operator to provide as-built engineering plans and specifications of the leachate collection system in place, to assume liability for all contamination of waterways or groundwater for the life of the landfill and one year thereafter, and to provide at its expense for treatment and disposal of any leachate

withdrawn from the landfill site. The relationship between these conditions and the second statutory criterion is obvious, and the County Board's determination that the criterion was met is not against the manifest weight of the evidence.

(C)

The PCB upheld the County Board's finding that the proposed expansion would be located so as to minimize incompatibility with the character of the surrounding area and the effect on the value of the surrounding property.

At the hearing Allen Kracower testified that the land use to the north of the fill site, consisting of "single family" land use along with some undeveloped open space, was compatible with the proposed expansion because of the "green buffer," a vacant area held by the District, in between. Similarly, land east of the site was, for about 4,000 feet, owned by the District and formed a buffer between the site and any urbanization to the west or east of Gary Avenue. To the south, a 400-foot wide strip between the site and Schick Road, combined with Schick Road itself and a berm between Schick Road and the fill itself, formed a buffer between the site and land to the south which was used primarily for single-family and various industrial purposes. The witness testified that berming was and would be in place all along the border between the landfill site and the land immediately to the west, which fell within the corporate limits of the village of Hanover Park and was used mostly for single-family purposes. This berming would shield the land from "unsightly factors" and "unsatisfying noise conditions" originating from the fill.

In Kracower's opinion both the present and proposed landfill were compatible with surrounding land uses and would not "render any significant adverse impact," thus satisfying the third statutory criterion. Kracower believed the proposed expansion was compatible with surrounding land uses despite the expansion and urbanization going on in the area. He pointed out that the facility had not had any impact thus far on a recent residential development.

James Andrews testified that under the petitioners' proposal, the berming presently on the west side of the site would be extended westward and northward in order to screen the operation of the fill.

William A. McCann testified that he had made a study of the effect of the proposed expansion on the value of surrounding properties, primarily residential areas south and west of the site and found that the presence of the fill to date had had "no discernible impact" on the value of area homes. McCann testified that the establishment of the

landfill did not discourage single-family land uses nearby and that other landfill operations had not, according to his studies, adversely affected development and appreciation of residential land uses. In his opinion, the proposed expansion met the third statutory criterion.

Richard Utt, superintendent of construction and development for the District, admitted that the District got "a great deal of complaints *** going back to 1978," and "[has] had complaints over the past" about litter from the fill on the roads, but that complaints "have been diminished *** [to] a very low level."

Steve Fidesco, who lived just north of the fill, stated that "on any day *** [the fill] does smell."

The County Board conceded that odors and debris continued to pose some problems, "although conditions appear to have improved in the last few years." The County Board nonetheless found that petitioners had met their burden on the third criterion. This finding is not against the manifest weight of the evidence. The third criterion would not seem to require proof that the applicants can assure the public of an odor-free landfill or roads utterly devoid of stray papers from the landfill site. Few applicants could gain approval under a standard so strict. The testimony adequately showed that petitioners had taken and planned to take steps to do what they could to minimize the impact of the fill on surrounding areas and that the operation of the fill had not heretofore discouraged the development of the surrounding area.

### (D)

All the evidence at the hearing supported the County Board's conclusion that the proposed expansion was in fact outside the flood plain.

### (E)

The PCB accepted the County Board's conclusion that the danger of fires, spills, or other accidents at the site as proposed was remote. We agree with the PCB that the danger of leachate migration from the fill does not fit within this criterion, which appears concerned with the sudden calamities or disasters.

James Andrews testified that the facilities at the landfill site were adequate for safety and fire protection, both for the present operation and the proposed expansion. Andrews' written comments reiterated these conclusions.

The finding of the County Board as to this criterion, because of the lack of any evidence that there was inadequate protection against

fires or accidents or any evidence of prior incidents at the site, indeed, is within the manifest weight of the evidence.

### (F)

Most of the testimony on the sixth criterion came from Gerald E. Lindgren, a professional engineer and consultant with Barton-Aschman Associates, Inc., a multidisciplinary consulting firm. Lindgren, at petitioners' request, made a study to determine the impact on traffic patterns of the proposed expansion. The study found that traffic volume on Schick Road and Gary Avenue had increased substantially since 1978, largely because of residential development. At the same time, however, Gary Avenue and Schick Road had been improved to "basically four-lane facilit[ies]" with additional turning lanes at major intersections and traffic signals at the intersection of Gary Avenue and Schick Road.

According to the study, a level of traffic known as "level of Service A" would be maintained through the intersection "under its current improvement," a "level of Service B" could be maintained even if the volume of traffic through the intersection doubled, and that even under a "wors[t] case condition," where the number of trucks going in and out of the landfill doubled and existing traffic on the roadway increased by 50%, with all of the increase in traffic going through the intersection, a "level of Service C operation" could still be maintained. The "level of Service C," Lindgren explained, "is generally what is considered to be the design level of service for a particular facility as utilized, standard practice." Levels A and B "are *** a better operation, a more convenient operation for the general public."

Lindgren noted that the fill currently accounted for 12% of the traffic on Schick Road, as opposed to 44% the last time he had surveyed traffic patterns there. With increased overall traffic, the percentage would be even less.

Lindgren testified that additional improvements on Schick Road were anticipated, as the Du Page County Highway Department planned to improve the roadway from Gary Avenue "to and including the access to the landfill operation."

In Lindgren's opinion the proposed expansion would not adversely affect traffic conditions in the area.

There were assertions by area residents that truck traffic to and from the landfill was annoying and that the annoyance would increase with the proposed improvement.

The County Board found that the petitioners had satisfied the sixth criterion, in part because "the County has plans to widen Schick

Road in the future, so that we can find no reason for believing that the landfill materially impacts on traffic flows." The PCB reversed because the record did not detail the County's road construction plans although there was other competent evidence of record to show that the criterion had been satisfied. Virtually all of the evidence at the public hearing, however, indicated that the proposed development's traffic patterns were designed to minimize the impact on existing traffic flow. Lindgren, in fact, concluded that the proposed expansion would *have* no substantial impact on existing traffic patterns. His testimony that the County planned to widen Schick Road, which was not objected to, was not essential to this conclusion.

There is nothing in the record to indicate how traffic patterns for the proposed expansion could have been designed so as to control the impact on existing traffic flows more than as proposed. The statute does not require petitioners to show that the expansion will have *no* adverse impact on existing traffic flows, but only that the design adopted minimizes this impact. Because the proposed expansion is a build-up of the existing landfill on the same site, it is difficult to see how petitioners could have designed "better" traffic patterns than the ones at issue. In any event, the County Board's finding that petitioners met this criterion is within the manifest weight of the evidence.

The petitioners have met their burden of proof on all six criteria included in the statute and the County Board's findings are not against the manifest weight of the evidence. The PCB rejected the findings basically for the failure of the board to "clearly indicate the information it finds persuasive, and comment on what it does not *** and to relate from which the statutory criteria its conclusions flow." Although the statute does not require the County Board to make written decisions which specify the reasons for its decisions, "such reasons to be in conformance with subsection (a) of this Section" (Ill. Rev. Stat. 1981, ch. 111½, par. 1039.1(e)), nothing in the statute would require a detailed examination of each bit of evidence or a thorough going exposition of the County Board's mental processes. Rather, the County Board need only indicate which of the criteria, in its view, have or have not been met, and this will be sufficient if the record supports these conclusions so that an adequate review of the County Board's decision may be made. The assertion that the County Board's opinion must state from which of the criteria the conditions flow finds no basis in the statute. The failure to detail the relation between the conditions and the criteria is not fatal since it does not interfere with the orderly review of the County Board's decision. We hold that the evidence supports that decision.

Although we uphold the County Board's approval of the permit application we must state our concern with a statute which as applied here places the reviewing body and the applying body in the same hands, thus creating a patent conflict of interest. Unfortunately, we can find no basis under the statute for transfer of the hearing to any other body. We think, however, that the legislature should address the dangers of unfairness and the appearance of unfairness that may arise under the new statute.

We reverse the decision of the Illinois Pollution Control Board, and reinstate the site approval decision of the County Board of Du Page County.

Reversed.

LINDBERG and REINHARD, JJ., concur.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

JUSTICE SEIDENFELD delivered the opinion of the court:
 The village of Hanover Park in seeking a rehearing contends that the rights of the village and its citizens to litigate the issuance of landfill permits are a species of property protected by the Federal fourteenth amendment due process clause, citing *Logan v. Zimmerman Brush Co.* (1982), 455 U.S. 422, 429, 71 L. Ed. 2d 265, 273, 102 S. Ct. 1148, 1154. They argue that the right to have an opportunity to present their case and have its merits fairly judged (*Logan v. Zimmerman Brush Co.* (1982), 455 U.S. 422, 433, 71 L. Ed. 2d 265, 276, 102 S. Ct. 1148, 1156) may not be circumscribed by the State, and that this due process right prevails over the legislatively created necessity as stated in our opinion.

*Logan* held that an employee's right to a hearing under the Federal Employment Practices Act is a species of "property" which cannot be denied without due process. The analogy between a third party's right to participate in litigating a landfill application and the cause of action which was completely cut off in *Logan* is not sound. First, in *Logan* the employee, if not given the chance to litigate, could be deprived without a hearing of a personal property right in continued employment, in that case the right not to be fired for a nonrelevant handicap. Here, the village and its citizens have no underlying property right, as we have noted in our opinion, to be protected. Second, the villagers have not been deprived of the right to litigate the matter; at most they have been forced to do so before a board which

has an apparent conflict.

The effect of the village's argument is to turn all statutory rights to a hearing, or to participation in a public hearing, into constitutionally protected property interests and then to make these hearings void if conducted by biased adjudicators. This borders on a suggestion that the rule of necessity be abolished altogether, which *Logan* cannot be said to stand for.

Moreover, the village's argument is self-contradictory. It claims that it has a property right to use the statutory hearing procedure to contest the permit application. It must necessarily follow from the village's argument that it is claiming that petitioners have no similar right to invoke the statutory procedure to obtain their permit. The village is asking that petitioners be denied any chance of a hearing because of bias in the tribunal designated by the legislature. Thus, in asserting a property right to an unbiased statutory hearing, the village insists that petitioners get no right to a hearing at all under the same statute.

The village also asserts that it has the right to invoke the due process clause to argue that the statute is unconstitutional as applied. However, the law in Illinois is contrary. See *Supervisors of the County of Boone v. Village of Rainbow Gardens* (1958), 14 Ill. 2d 504, 508; *Meador v. City of Salem* (1972), 51 Ill. 2d 572, 578.

We therefore adhere to our opinion.

LINDBERG and REINHARD, JJ., concur.